SAMUEL MARSH, WILLIAM E. LEE, AND EDWARD C. DELAVAN, PLAINTIFFS IN ERROR, v. EDWARD BROOKS, AND VIRGINIA C. HIS WIFE, CHARLES P. BILLON, AND FRANCIS E. HIS WIFE, WALTER G. REDDICK, AND DABNEY C. REDDICK.

This court decided, in 8 Howard, 223, that the recitals in a patent for land, referring to titles of anterior date, were not of themselves sufficient to establish the titles thus recited.

The titles themselves being now produced, it is decided, that a permit, given by the Lieutenant-Governor of Upper Louisiana, in 1799, to a person to form an establishment on the Mississippi, followed by actual possession and improvement, entitled the occupant to 640 acres, including his improvements, although the Indian title was not then extinguished.

It was not the practice of the Spanish government to make treaties with the Indian tribes, defining their boundaries; but to prevent settlements upon their lands without special permits. Such permits, however, were usual.

The construction of the treaty between the United States and the Sac and Fox Indians, must be that the latter assented to an occupancy which was as notorious as their own.

The act of Congress, approved April 29, 1816, (3 Stat. at Large, 328,) confirming certain claims to land, confirmed this one, although the Recorder of Land Titles, in his report, made in 1815, had added these words, "if Indian title extinguished." These words were surplusage.

THIS case was brought up, by writ of error, from the District Court of the United States for the Southern District of Iowa.

It was before this court at January term, 1850, and is reported in 8 Howard, 223.

The children and heirs of Thomas F. Reddick, (the defendants in error,) were the plaintiffs in the court below, having brought their action by writ of right, according to the practice of the courts in Iowa, to recover 640 acres of land upon the right bank of the Mississippi River.

The acts of Congress and the patent to Reddick are set forth in 8 Howard, to which the reader is referred. But the plaintiffs having offered additional evidence, it may be proper to bring the whole into one view. In the former trial the plaintiffs relied on the recitals in the patent to Reddick to prove the title of Tesson: but this court having decided that those recitals were insufficient, the evidence produced upon the trial of the present suit in the District Court was the following:

### Plaintiffs' Evidence.

1. The plaintiffs proved, that Louis Honoré Tesson settled on the land in controversy, in 1798, and on the 30th of March, 1799, obtained from the Spanish government, a written permit to settle thereon, which is recited at length in the record.

2. That Tesson had possession, and inhabited, cultivated, and had houses and orchards and fields on said lands, in 1798, 1799, 1800, and until 1805; and that all his right, under the permit and settlement, passed, by mesne conveyances, to said Thomas F Reddick.

3. That said Reddick duly presented and proved before the Recorder of Land Titles at St. Louis, his claim, and claim of title from Tesson to said land; and that said Recorder, by his report, dated November 1st, 1815, reported on said claim his opinion, as follows: "Granted 640 acres, if Indian rights extinguished."

4. The act of Congress, approved April 29th, 1816, (3.U. S. Stat. at Large, p. 328, ch. 155,) "for the confirmation of certain claims to land in the Western District of the State of Louisiana, and in the Territory of Missouri."

5. That on the 17th of May, 1838, a patent certificate, (No. 1157,) was delivered, by the Recorder of Land Titles at St. Louis, to Edward Brooks, (one of the original plaintiffs,) for the land referred to in the report of November 1st, 1815.

6. A patent of the United States, issued to Thomas F. Reddick, described as assignee of Joseph Robidoux, assignee of Louis Honoré Tesson, for the lands in controversy, dated the 7th February, 1839.

7. They also proved, that they, the plaintiffs, were the heirs and legal representatives of said Reddick; and that the defendants were in possession of the land in controversy, at the commencement of the suit, and rested their case.

### Defendants' Evidence.

The defendants then gave in evidence:

1. The treaty between the United States and the Sac and Fox Indians, (7 U. S. Stat. at Large, 229,) made at Washington on the 4th of August, 1824, by the first article whereof, these Indians ceded to the United States all their right and title to the lands claimed by them between the Mississippi and the Missouri rivers; and a northerly line, running from the Missouri, at the entrance of the Kansas River, north 100 miles, to the northwest corner of the State of Missouri, and thence east to the Mississippi; but with the understanding "that the small tract of land lying between the rivers Des Moines and Mississippi, and the section of the above line between the Mississippi and the Des Moines, is intended for the use of the half-breeds belonging to the Sac and Fox nations; they holding it, however, by the same title, and in the same manner, that other Indian titles are held."

2. The act of Congress, approved June 30th, 1834, (4 U. S. Stat. at Large, ch. 167, p. 740,) "to relinquish the reversionary interest of the United States in a certain Indian reservation lying between the rivers Mississippi and Des Moines."

3. That the land in controversy is included within the interior boundary lines of the Sac and Fox half-breed reservation, referred to in the treaty of 1824, and act of Congress of 1834.

4. The act of Congress of July 1st, 1836, (6 U. S. Stat. at Large, p. 661,) by which the United States relinquished to the heirs of said Thomas F. Reddick, their right in the lands embraced in said patent—but reserving any older or better claim not emanating from the United States, and providing, that in case said lands should be included in any reservation theretofore

made under treaty with any Indian tribe, Reddick should be authorized to make another location on unappropriated lands.

5. That the 640 acres of land referred to in said act of Congress, of July 1st, 1836, lie within the exterior boundary lines of said Sac and Fox half-breed reservation, made by the treaty of August 4th, 1834.

6. That the land in controversy is worth more than $2000.
The defendants then rested their case.

The plaintiffs then prayed the court to instruct the jury—

1. That under the treaty with France, of the 30th April, 1803, and the several acts of Congress passed in pursuance thereof, for settlement of titles in the Territory of Missouri, Tesson and Reddick, as his assignee, had a valid subsisting interest in the land in controversy, at the date of the report made by the Recorder, which was not divested by the reservation in the treaty with the Sac and Fox Indians, or the act of Congress of the 30th June, 1834.

2. That the claim of Tesson, and of Reddick, as his assignee, as reported, was substantially confirmed by the act of Congress, approved April 27th, 1816.

3. That the patent, taken in connection with other evidence, conveyed to the plaintiffs a fee-simple title to the land in controversy, and overrides the title set up by defendants.

These instructions were given by the Court.

The defendants then prayed the court to instruct the jury—

1. That under the report of the Recorder of Land Titles, given in evidence by the plaintiffs, they are not entitled to recover the land, unless their title thereto has been confirmed by an act of Congress. This instruction was given by the court.

2. That the true construction of the act of Congress of the 29th of April, 1816, given in evidence by the plaintiffs, does not confirm their title to the lands sued for, if the Indian title to the same was not at that time extinguished.

3. That the treaty of August 4th, 1824, with the Sac and Fox Indians, is a recognition by the United States, at the date of said treaty, of the Indian right to the lands in controversy; the same being within the Sac and Fox half-breed reservation.

4. That the Indian title to the land in controversy was not extinguished prior to the 4th of August, 1824.

5. That the plaintiffs have shown no right to recover the land in controversy in this suit.

The first of these instructions, prayed for by the defendants, was given by the court; but the second, third, fourth, and fifth instructions, as prayed, were refused to be given.

The defendants, by their counsel, excepted to the rulings and

decisions of the court in giving the instructions prayed for by the plaintiffs, and in refusing to give the second, third, fourth, and fifth instructions, prayed for by the defendants.

The jury, under these instructions, found a verdict for the plaintiffs, and a bill of exceptions brought these several rulings before this court for review.

It was argued by *Mr. Butler*, for the plaintiffs in error, and *Mr. Geyer*, for the defendants in error.

*Mr. Butler*, for the plaintiffs in error, made several points. The one upon which the decision of the court chiefly turned, was the following:

II. The District Court erred, in giving to the jury the several instructions prayed for by the counsel for the plaintiffs below.

1. The instruction, "that under the treaty with France of the 30th of April, 1803, and the acts of Congress, Tesson, and Reddick as his assignee, had a valid subsisting interest in the land in controversy, at the date of the report made by the Recorder, which was not divested by the reservation in the treaty with the Sac and Fox Indians, or the act of Congress of the 30th of June, 1834," was erroneous.

(After analyzing the treaty, and the several acts of Congress from that time to 1815, *Mr. Butler* came to the following conclusion:)

Neither under the treaty, nor under any one of the above-cited acts, or all of them combined, had Reddick, as the assignee of Tesson, a valid subsisting interest in the land in controversy, at the date of the Recorder's report, November 1, 1815.

- 1. Under the treaty, every species of title to lands in Louisiana, emanating from the French or Spanish governments — whether perfect and complete, or inchoate and incomplete — was recognized and protected as "property;" but mere permits to make settlements on such lands, even when lawfully granted by such authorities, conferred no right of property within the meaning of the treaty. Les Bois v. Bramell, 4 How. 463; Soulard & Smith v. United States, 4 Pet. 511; Smith v. United States, 10 Id. 326; Wherry v. United States, 10 Id. 328; Chouteau v. Eckhart, 2 How. 344; Menard's heirs v. Massey, 8 Id. 293, 308, 806; Bissell v. Penrose, 8 Id. 317; Landes v. Brant, 10 Id. 348; Glenn v. United States, 13 Id. 250; Heirs of Vilemont v. United States, 13 Id. 261.

2. The equitable claim of settlers under such permits, upon the justice or bounty of the government, to complete their titles, devolved, after the treaty of cession, on Congress, who, by the several statutes above cited, have acted upon and regulated the subject. Cases above cited.

3. No specific quantity, and no definite location, are mentioned in the written permit to Tesson; he is merely permitted to establish himself, for the purpose of trade with the Indians, at the head of the rapid of the River Des Moines. No survey could have been made, nor was any made or contemplated, under this permit; nor did any interest, in any particular tract, pass by it to Tesson. United States v. Forbes, 15 Peters, 173; Same v. Buyck, Id. 215; Same v. O'Hara, Id. 275; Same v. Delespine, Id. 319; Same v. Miranda, Id. 153; Same v. King, 3 How. 773: Same v. Lawton, 5 Id. 10; Same v. Villalobos, 10 Id. 541; Same v. Boisdore, 11 Id. 62; Same v. Lecompte, Id. 115; Same v. Vilemont, 13 Id. 261; Bissell v. Penrose, 8 Id. 317.

4. Tesson, after making his establishment, was to apply to the Governor-General, to obtain a grant of a convenient space for the use of his establishment; and, until the obtaining of such grant, Tesson neither had, nor could equitably claim, any interest whatever in any specific tract or lot.

5. This permit to Tesson was, therefore, a mere license to reside and trade in the Indian country; it was wholly insufficient to extinguish the Indian title in any particular tract, or to sever any particular tract from the public domain; and, unless confirmed by Congress, and duly located by their authority, Tesson had, and could have no standing, under said permit, in a court of justice. Cases above cited.

See, as to the Indian title, and the proceedings necessary to extinguish it, the following cases: — United States v. Arredondo, 6 Pet. 691, 741; Mitchell v. United States, 9 Id. 711; S. C. 15 Id. 52, 83, 88; United States v. Fernandez, 10 Id. 303; Marsh v. Brooks, 8 How. 223; Gaines v. Nicholson, 9 Id. 356; United States v. D'Auterive, 10 Id. 624.

6. Whatever power, under the acts of Congress passed prior to the date of the Receiver's report, that affair might have to grant or confirm to Tesson's assignee, as a donation, the land claimed by him, neither of said acts had, by itself, confirmed his claim.

The first branch of the instruction now under review — that Tesson, and his assignee, on the 1st of November, 1815, had a subsisting interest in the land in controversy — was, therefore, erroneous.

*Mr. Geyer*, for the defendants in error, divided his points as follows:

That a complete title to the land in controversy was vested in Thomas F. Reddick, on the 29th of April, 1816, whether the "Indian rights" had, or had not, then been extinguished; and

the title so vested has not been divested or impaired, by any subsequent treaty or act of Congress.

A confirmation of a title by act of Congress, not only renders it a legal title, but furnishes higher evidence of that fact than a patent, inasmuch as it is a direct grant of the fee by the government itself, whereas a patent is only an act of its ministerial officer. Grignon's Lessee v. Astor, 2 How. 319, S. P.; Simms's Lessee v. Irvine, 3 Dal. 405; Strother v. Lucas, 12 Pet. 410.

The grant to the half-breeds by the act of 30th of June, 1834, does not affect the grant to Reddick, by the act of 29th of April, 1816. It is a principle applicable to every grant, that it cannot affect preëxisting titles. Polk's Lessee v. Wendall, 5 Wheat. 293; 9 Cr. 87; Patterson v. Loinn, 11 Wheat. 380; Stoddard et al. v. Chambers, 2 How. 284.

II. The confirmation by the act of 29th April, 1816, vested in Reddick the title, subject only to the Indian right of occupancy, if not then extinguished. All grants by the government are subject to such rights, whether expressly reserved or not, but as soon as they are extinguished by cession or otherwise, the grantee of the government acquires full dominion over the property. Fletcher v. Peck, 6 Cranch, 87, 137, 143; Mitchell v. United States, 9 Pet. 711; United States v. Hernandez, 10 Pet. 304.

III. The report of the Recorder of Land Titles is an approval of the claim of Reddick, and a recommendation that six hundred and forty acres of land be granted to him, " if Indian rights extinguished." Referring it to Congress to determine the whole question. Congress must therefore be understood to have decided that the Indian rights were extinguished, or to have made the grant subject to such rights, and in either case the title of the defendants in error is complete; all such rights having been extinguished before the commencement of the suit.

IV. Although the grantee of the government takes, subject to the Indian right of occupancy, the existence of such right is not presumed, nor is the grantee bound to prove its extinguishment in an action against a mere intruder, especially where, as in this case, the grant is by an act of Congress.

V. If the Indian right of occupancy could be set up as a bar to a recovery under a grant by act of Congress, which is denied, it was incumbent on the defendants below to prove the existence of such right at the time of the commencement of the suit. No such proof was made; on the contrary, so far as the evidence discloses the existence of any claim by any Indian tribe, that claim appears to have been extinguished in 1824, so that at that time, if not before, Reddick acquired the absolute dominion and right of possession.

VI. The permit granted by the Spanish Government to Louis Honoré Tesson, to settle upon, occupy, and cultivate the land in controversy, as his property, excluded all Indian rights. The grants of the Spanish government were not subject to Indian rights, but operated as extinguishments of such rights on the lands granted. At the date of the treaty by which Louisiana was acquired, the title of Tesson, though incomplete, was property protected by the treaty; that title, with all its incidents, was recognized by the laws of the United States, and confirmed by the act of 29th April, 1816; so that according to the record, no Indian right of occupancy existed since 1798.

VII. If the existence of an Indian right had been recognized by the treaty of 4th August, 1824, as asserted in the third refused instruction, such recognition would not have affected the title of Reddick, granted in 1816. But that treaty recognizes no such right; it is merely a relinquishment of a claim by the Sacs and Foxes, a quitclaim by the Indians, and not a recognition of their title by the United States.

The Sacs and Foxes, by a treaty of 3d November, 1804, (Stat. at Large, vol. 7, p. 84,) ceded to the United States all their claim to the lands east of a line drawn from a point on the Missouri River, opposite the mouth of Gasconade, to a point on the River Jeffreon, thirty miles above its mouth, thence down that river to the Mississippi River, and up the same to the mouth of Wisconsin River, &c.

The Great and Little Osages, by a treaty of 10th November, 1808, ceded to the United States all lands "northwardly of the Missouri River." A survey of the boundary was provided for in the seventh article, and was made in 1816; the north boundary being coincident with the north boundary of the now State of Missouri.

The Osages, as well as the Sacs and Foxes, had set up claims to lands north of the Missouri, and both relinquished to the United States. But in 1824, the Sacs and Foxes still pretended to have a claim within the bounds of the State of Missouri, which is relinquished by the treaty of 1824.

It cannot be assumed that the title to the country, embracing the land in controversy, was in the Sacs and Foxes at any time; nor can the party claiming under a grant of the Spanish Government, confirmed by act of Congress, be required to prove that it was not, or that their treaty of 1804 included the land granted. The party who undertakes to maintain a possession against such a title, by showing an outstanding title or right of occupancy, takes upon himself the burden of proving it.

Mr. Justice CATRON delivered the opinion of the court.

This case was before us in 1850, and is reported in 8 Howard. We then held that as the patent to Reddick's heirs of 1839 was younger than the treaty of 1824, and the confirming act of 1836, by which the title of the United States was *primâ facie* vested in the Sac and Fox half-breeds, the patent could not prevail. Nor could its recitals be relied on to give it legal effect from an earlier date than it had on its face.

The judgment was then reversed, and the cause remanded for another trial, and an intimation given, that probably additional evidence might be adduced on a subsequent trial, which would establish an earlier and better title in the plaintiffs, than that of the half-breeds. That trial has taken place, and the case is now before us, with the evidence to which the recitals in the patent of Reddick's heirs, to some extent, refer. This evidence consists of a permit given by the Lieutenant-Governor of Upper Louisiana to Louis Honoré Tesson, to establish himself at the head of the rapids of the River Des Moines, (being a great rapid in the River Mississippi,) and having formed his establishment, he was assured that then it would be the duty of the Governor-General of Louisiana, residing at New Orleans, to procure for said Honoré, a concession of sufficient space to render the establishment available and useful to the trade of the country in peltries, and so that said Honoré might exercise an oversight of the Indians, and keep them in the fidelity which they owed to His Catholic Majesty; the object being to increase the trade with the Indians on that border; and in which said Honoré was permitted to be a participant, and to trade with the Indians in that part of His Majesty's dominions; nor were any rival traders to be allowed to deal with the Indians, except such as had a passport for that purpose, signed by the Lieutenant-Governor. This stipulation was made in March, 1799. Honoré was then in possession of the land in dispute, and had improvements on it; and he improved it further under the permit of 1799, and continued there until 1805. He had houses, orchards, and fields.

Thos. F. Reddick's claim was regularly derived by assignments from Honoré. Reddick's heirs, claimed a league square, on the assumption that the permit to settle and inhabit, entitled Honoré to this quantity. But the Recorder at St. Louis, acting as Commissioner, rejected the claim for a league square; and properly, as we think; there being only a promise of title in future, but no concession of land, in the Lieutenant-Governor's permission to Honoré to establish himself, and occupy the premises, and trade with the Indians. As, however, Honoré held actual possession, and had improved the land in an expensive

44*

and substantial manner, he was beyond question entitled to six hundred and forty acres, including his improvements, under our acts of Congress securing this quantity to actual settlers, had the land laid within that part of Louisiana to which the Indian title was extinguished, at the time when the occupancy existed. Being uι certain whether Honoré was entitled, by reason of his inhabitation and cultivation within territory to which the Indian title was not extinguished, the Recorder, in his tabular statement, granted the six hundred and forty acres, " if Indian rights extinguished." And this expression has embarrassed the title for more than thirty years. There were many claims in the Recorder's report and tabular statement, in which this one is found; and by the act of April 29, 1816, all of them were confirmed without exception, and without any notice having been taken of the Recorder's remark, referring to an existing Indian title to the land. That the Sacs and Foxes did claim the country generally, where this land lies, is not controverted; nor was their claim ceded to the United States till 1824. And this raises the question whether, according to Spanish usage, whilst that power governed Louisiana, an existing Indian claim to territory precluded inhabitation and cultivation under a permit to inhabit and cultivate a particular place designated in the permit, and which was in the Indian country. Spain had no treaties with any of the Indian tribes in Louisiana, fixing limits to their claims, so far as we are informed. The Indians were kept quiet, and at peace with Spanish subjects, by kind treatment and due precautions, which did not allow obtrusion on lands claimed by them, without written permits from the Governor; but that such permits were usual, cannot be doubted. The county of St. Charles lies in the fork of the Mississippi and Missouri rivers; it was settled, and the village of St. Charles established there, twenty years and more before we acquired Louisiana; and yet, by the treaty of November 3d, 1804, this section of country was ceded to the United States, by the Sac and Fox tribes, extending from the Missouri River, opposite to the mouth of the Gasconade, to' the Janfilione, or " North 2 rivers," as now known; which empties into the Mississippi, in the county of Marion, in the State of Missouri. This country was as solemnly ceded, as was the country north of that cession, by the treaty of 1824; and which treaty is here set up in opposition to Reddick's title. The treaty of 1804 was duly ratified by the Senate of the United States, and apparently sanctioned, retrospectively, the Sac and Fox claim to the old county of St. Charles, in like manner that the treaty of 1824 recognized an existing Indian claim to the half-breed tract, where the land in dispute lies.

And again in 1808, the Osages ceded to the United States all the lands east of a line running from Fort Clark on the Missouri River, situate a few miles below the mouth of the Kansas; thence, due south to the River Arkansas, and down the same to the Mississippi; up the same to Sullivan's line; then west to the north-west corner, being a point one hundred miles due north of the mouth of the Kansas River; and with this line south to the north bank of the Missouri opposite the mouth of the Kansas. Sullivan's line was run in 1816, in execution of the Osage treaty of 1808, and is the northern boundary of the half-breed tract, and the line referred to in the treaty of 1824 with the Sacs and Foxes, and which the Osage treaty of 1808, included.

This treaty had every sanction that a ratification by our Senate could give it, and is a recognition of an Indian title in the Osages to nearly all the territory now embraced in the State of Missouri, and the greater part of Arkansas; and of an Osage right to the land claimed by Reddick up to November, 1808; and yet the county and town of St. Louis, the seat of government in Upper Louisiana during the existence of the Spanish colonial government there, the post of New Madrid, the county, town, and post of St. Charles, — were all within the cession made by the Osages; and within which cession, lay a great mass of Spanish orders of survey and grants, in regard to which this country has been legislating and adjudicating for nearly fifty years, without any one ever supposing that such concessions were affected by these loose Indian pretensions set up to the country at a time when the concessions were made; pretensions that the Spanish government notoriously disregarded, further than a cautious policy required. If permits to inhabit and cultivate were given in so many other instances, regardless of Indian claims, no reason exists why Honoré Tesson, could not lawfully improve the land in dispute under his permit; and in view of this notorious state of facts, the treaty of 1804 with the Sacs and Foxes, by an additional article, declared that nothing in that treaty contained should affect the claim of any individual (or individuals, if more than one) who had obtained grants of land from the Spanish government beyond the boundary lines of the country then ceded to the United States, on lands claimed by the Sacs and Foxes, but not ceded by that treaty; provided, that such grants had at any time been made known to the said Indian tribes, and recognized by them. That the large, valuable, and notorious improvements were made by Honoré, at a place where the Sacs and Foxes themselves resided at the time, is a historical fact. He resided there as notoriously as they did. His claim to this property was transferred to Reddick, and was

Marsh et al. *v.* Brooks, et al.

occupied for twenty-five years under Tesson and Reddick, and his heirs before the treaty of 1824 was made. It was held and improved by authority of the Spanish government, and claimed as individual property, to which the Indian right of possession did not extend; of this the Indians never complained, nor do they now complain; no half-breed owner and Indian descendant is defending this suit; it is defended by trespassers, showing no color of claim under the half-breeds, or any one else; shelter is sought under the assumption that Honoré's permit and inhabitation were neither known or recognized by the Sacs and Foxes, and that therefore, the additional article of the treaty of 1804, cannot protect the title of Reddick. We concur with the opinion of Mr. Attorney-General Grundy, in his report of 1839 on Reddick's title, to the Secretary of the Treasury, (Opinions of Attorney-Gen., 1230,) that it must be presumed that the Indians both had knowledge and assented to Honoré's claim; and we are furthermore of opinion, that the Indian tribes, and the half-breeds, who claim under them, must be held to knowledge, and to consent, that Honoré took and held, rightful possessions, from the fact of his open and notorious actual occupancy, and holding for himself, in their midst. This is the settled rule in other cases, and no reason is seen why it should not apply in this case. The reasons are quite as strong, and the rule quite as necessary in its application here, as it was in the case of Landes *v.* Brant, (10 How. 375,) where we enforced the rule. We are therefore of opinion that the supposed Indian right of occupancy did not affect the confirmation by Congress in this case, and that the remark of the recorder, " If Indian rights extinguished," was surplusage, and which remark Congress properly disregarded.

That the confirmation of 1816 carried the title with it, if the confirmation was valid, has so often been decided by this court, that it is not open to discussion; nor is it disputed here on behalf of the defendants below. The confirming act of 1816, however, ordered that a patent should issue according to a survey afterwards to be made, in all cases confirmed by the act. This has been done. The patent recites the necessary facts to connect the confirmation with the patent, and gives date to it by relation, as a legal title, from the 29th of April, 1816, according to the boundaries set forth in the patent; and as this ruling covers all the instructions that were given in the court below, and all such as were refused, we order that the judgment be affirmed.

*Order.*

This cause came on to be heard on the transcript of the

record from the District Court of the United States for the Southern District of Iowa and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said District Court in this cause be, and the same is hereby, affirmed with costs.