UNITED STATES, AS GUARDIAN OF THE HUAL-PAI INDIANS OF ARIZONA, *v.* SANTA FE PA-CIFIC RAILROAD CO.

No. 23. Argued November 12, 13, 1941.—Decided December 8, 1941.

*Mr. Nathan R. Margold,* with whom *Messrs. Richard H. Hanna, William A. Brophy,* and *Felix S. Cohen* were on the brief, for the United States. *Assistant Solicitor General Fahy* filed a memorandum.

342

*Messrs. Joyce Cox* and *Max Radin,* with whom *Messrs. Charles H. Woods, Lawrence Cake,* and *Richard M. Fennemore* were on the brief, for respondent.

*Messrs. Joe Conway,* Attorney General of Arizona, and *Earl Anderson,* Assistant Attorney General, filed a brief on behalf of that State and Coconino, Mohave, and Yavapai Counties, Arizona, as *amici curiae,* in support of respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the court.

This is a suit brought by the United States, in its own right and as guardian of the Indians of the Walapai (Hualpai) Tribe in Arizona (28 U. S. C. § 41 (1), § 24 Judicial Code) to enjoin respondent from interfering with the possession and occupancy by the Indians of certain land in northwestern Arizona. Respondent claims full title to the lands in question under the grant to its predecessor, the Atlantic and Pacific Railroad Co., provided for in the Act of July 27, 1866, 14 Stat. 292. The bill sought to establish that respondent's rights under the grant of 1866

are subject to the Indians' right of occupancy both inside and outside their present reservation which was established by the Executive Order of President Arthur, January 4, 1883. The bill consists of two causes of action—the first relating to lands inside, and the second, to lands outside, that reservation. The bill prayed, *inter alia*, that title be quieted and that respondent "account for all rents, issues and profits derived from the leasing, renting or use of the lands subject to said right of occupancy" by the Indians. Respondent moved to dismiss on the ground that the facts alleged were "insufficient to constitute a valid cause of action in equity." The District Court granted that motion. The Circuit Court of Appeals affirmed. 114 F. 2d 420. We granted the petition for certiorari because of the importance of the problems raised in the administration of the Indian laws and the land grants.

Sec. 2 of the Act of July 27, 1866, the Act under which respondent's title to the lands in question derived,[1] provided: "The United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act."

Basic to the present causes of action is the theory that the lands in question were the ancestral home of the Walapais, that such occupancy constituted "Indian title" within the meaning of § 2 of the 1866 Act, which the United States agreed to extinguish, and that in absence of such extinguishment the grant to the railroad "conveyed

---

[1] Earlier cases involving this grant are *United States* v. *Southern Pacific R. Co.*, 146 U. S. 570; *Atlantic & Pacific R. Co.* v. *Mingus*, 165 U. S. 413; *Santa Fe Pacific R. Co.* v. *Lane*, 244 U. S. 492; *Santa Fe Pacific R. Co.* v. *Fall*, 259 U. S. 197; *Santa Fe Pacific R. Co.* v. *Work*, 267 U. S. 511.

the fee subject to this right of occupancy." *Buttz* v. *Northern Pacific Railroad,* 119 U. S. 55, 66. The Circuit Court of Appeals concluded that the United States had never recognized such possessory rights of Indians within the Mexican Cession [2] and that in absence of such recognition the Walapais had no such right good against grantees of the United States.

Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from lands wandered over by many tribes), then the Walapais had "Indian title" which, unless extinguished, survived the railroad grant of 1866. *Buttz* v. *Northern Pacific Railroad, supra.*

"Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States." *Cramer* v. *United States,* 261 U. S. 219, 227. This policy was first recognized in *Johnson* v. *M'Intosh,* 8 Wheat. 543, and has been repeatedly reaffirmed. *Worcester* v. *Georgia,* 6 Pet. 515; *Mitchel* v. *United States,* 9 Pet. 711; *Chouteau* v. *Molony,* 16 How. 203; *Holden* v. *Joy,* 17 Wall. 211; *Buttz* v. *Northern Pacific Railroad, supra; United States* v. *Shoshone Tribe,* 304 U. S. 111. As stated in *Mitchel* v. *United States, supra,* p. 746, Indian "right of occupancy is considered as sacred as the fee simple of the whites." Whatever may have been the rights of the Walapais under Spanish law, the *Cramer* case assumed that lands within the Mexican Cession were not excepted from the policy to respect Indian right of occupancy. Though the *Cramer*

---

[2] See Treaty of Guadalupe Hidalgo, 9 Stat. 922.

case involved the problem of individual Indian occupancy, this Court stated that such occupancy was not to be treated differently from "the original nomadic tribal occupancy." (p. 227.) Perhaps the assumption that aboriginal possession would be respected in the Mexican Cession was, like the generalizations in *Johnson* v. *M'Intosh, supra,* not necessary for the narrow holding of the case. But such generalizations have been so often and so long repeated as respects land under the prior sovereignty of the various European nations, including Spain,[3] that, like other rules governing titles to property (*United States* v. *Title Insurance & Trust Co.,* 265 U. S. 472, 486–487) they should now be considered no longer open. Furthermore, treaties[4] negotiated with Indian tribes, wholly or partially within the Mexican Cession, for delimitation of their occupancy rights or for the settlement and adjustment of their boundaries, constitute clear recognition that no different policy as respects aboriginal possession obtained in this area than in other areas. And see *United States* v. *Kagama,* 118 U. S. 375, 381. Certainly it would take plain and unambiguous action to deprive the Walapais of the benefits of that policy. For it was founded on the desire to maintain just and peaceable relations with Indians. The reasons for its application to other tribes are no less apparent in case of the Walapais, a savage tribe which in early days caused the military no end of trouble.

---

[3] *Chouteau* v. *Molony, supra; Buttz* v. *Northern Pacific Railroad, supra; Cramer* v. *United States, supra; United States* v. *Shoshone Tribe, supra.* See Royce, Indian Land Cessions in the United States, 18 Publications of the Bureau of American Ethnology, Smithsonian Institution, Pt. 2 (1899) pp. 539–561, 639–643.

[4] Treaty of July 1, 1852, 10 Stat. 979 (Apache Nation); Treaty of October 7, 1863, 13 Stat. 673, 674 (Tabeguache Band of Utah Indians); Treaty of March 2, 1868, 15 Stat. 619, Act of April 29, 1874, 18 Stat. 36, Act of June 15, 1880, 21 Stat. 199 (Ute Indians); Treaty of June 1, 1868, 15 Stat. 667 (Navajo Tribe). For a schedule of Indian land cessions see Royce, *op. cit., supra* note 3, pp. 648 *et seq.*

Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the *Cramer* case, "The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive." 261 U. S. at 229.

Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political, not justiciable, issues. *Buttz* v. *Northern Pacific Railroad, supra,* p. 66. As stated by Chief Justice Marshall in *Johnson* v. *M'Intosh, supra,* p. 586, "the exclusive right of the United States to extinguish" Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts. *Beecher* v. *Wetherby,* 95 U. S. 517, 525.

If the right of occupancy of the Walapais was not extinguished prior to the date of definite location of the railroad in 1872, then the respondent's predecessor took the fee subject to the encumbrance of Indian title. *Buttz* v. *Northern Pacific Railroad, supra.* For on that date the title of respondent's predecessor attached as of July 27, 1866. *United States* v. *Southern Pacific R. Co.,* 146 U. S. 570; *Nelson* v. *Northern Pacific Ry. Co.,* 188 U. S. 108.

Certainly, prior to 1865 any right of occupancy of the Walapais to the lands in question was not extinguished; nor was the policy of respecting such Indian title changed. The Indian Trade and Intercourse Act of June 30, 1834, 4 Stat. 729, was extended over "the Indian tribes in the Territories of New Mexico and Utah" by § 7 of the Act of February 27, 1851, 9 Stat. 574, 587. The 1834 Act, which derived from the Act of July 22, 1790, 1 Stat. 137, made it an offense to drive stock to range or feed "on any land

belonging to any Indian or Indian tribe, without the consent of such tribe" (§ 9); gave the superintendent of Indian affairs authority "to remove from the Indian country all persons found therein contrary to law" (§ 10); made it unlawful to settle on "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe" (§ 11); and made invalid any conveyance of lands "from any Indian nation or tribe of Indians." § 12. The Act of 1851 obviously did not create any Indian right of occupancy which did not previously exist. But it plainly indicates that in 1851 Congress desired to continue in these territories the unquestioned general policy of the Federal Government to recognize such right of occupancy. As stated by Chief Justice Marshall in *Worcester* v. *Georgia, supra,* 6 Pet. p. 557, the Indian trade and intercourse acts "manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States."

The court below laid considerable stress upon the Act of July 22, 1854, 10 Stat. 308, as indicating that Congress recognized no rights of the Indians in Arizona and New Mexico other than those existing under Mexican law or created by reservations after the Mexican Cession. But we do not agree that, so far as the respondent's rights are concerned, that Act instituted a policy of non-recognition of Indian title. Nor do we think that it effected any extinguishment of that title.

The Act of 1854 established the office of Surveyor General of New Mexico. It donated land to certain qualified citizens (§ 2) with the exception, *inter alia,* of "military or other reservations." § 4. Unlike the Pre-emption Act of September 4, 1841, § 10, 5 Stat. 453, the 1854 Act did not extend only to "the public lands to which the Indian

title had been at the time of such settlement extinguished."
It did provide, however, that "any of the lands not taken"
under it should "be subject to the operation" of the Pre-
emption Act. § 7. Moreover, the 1854 Act provided as re-
spects the Territories of Nebraska and Kansas that the
grants should extend only to lands "to which the Indian
title has been or shall be extinguished." § 12.

From that it is argued that since Congress recognized
Indian title in Nebraska and Kansas and under the Pre-
emption Act but did not recognize it as respects the lands
in this area, a shift of policy in the Mexican Cession was
indicated. The issue here, however, is not between a set-
tler claiming under the 1854 Act and the Walapais.
Whether in such a case the 1854 Act should be construed
as extinguishing any Indian title to land taken under it
we need not decide.[5] Respondent does not claim under
that Act and hence can derive no rights from it.

Some stress is likewise placed on § 8 of the Act of July
22, 1854, and on the Act of July 15, 1870, 16 Stat. 291, 304.
The former required the Surveyor General for New Mexico
"to ascertain the origin, nature, character, and extent of
all claims to lands under the laws, usages, and customs
of Spain and Mexico"; and to make a report "on all
such claims as originated before the cession of the territory
to the United States by the treaty of Guadalupe Hi-
dalgo . . . denoting the various grades of title, with his
decision as to the validity or invalidity of each of the
same under the laws, usages, and customs of the country
before its cession to the United States." Such report was
to be "laid before Congress for such action thereon as may
be deemed just and proper, with a view to confirm *bona*

---

[5] The Act of 1854 is cited in Cohen, Handbook of Federal Indian
Law (1941) p. 308, for the statement that, "Only where it was neces-
sary to give emigrants possessory rights to parts of the public domain,
has Congress ever granted tribal lands in disregard of tribal possessory
rights."

*fide* grants, and give full effect" to the treaty. It was also provided that "until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act." The 1870 Act directed the Surveyor General for Arizona (which was separated as a Territory from New Mexico in 1863, 12 Stat. 664) "to ascertain and report upon the origin, nature, character, and extent of the claims to lands in said Territory under the laws, usages, and customs of Spain and Mexico." His report was to be "laid before Congress for such action thereon as shall be deemed just and proper."

These Acts did not extinguish any Indian title based on aboriginal occupancy which the Walapais may have had. In that respect they were quite different from the Act of March 3, 1851, 9 Stat. 631, passed to ascertain and settle certain land claims in California. Under § 13 of that Act "all lands the claims to which shall not have been presented" to the commissioners, appointed to receive and act upon all petitions for confirmation of land claims, "within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States." This Court passed on that Act in *Barker* v. *Harvey,* 181 U. S. 481. The plaintiff there claimed under two Mexican grants. The defendants were Indians who claimed a right of permanent occupancy; but they had not presented their claims to the commissioners within the time specified by § 13. This Court held that as a result of that failure their claims were barred. And see *United States* v. *Title Insurance & Trust Co.,* *supra,* 265 U. S. 472. That is to say, the Act of 1851 was interpreted as containing machinery for extinguishment of claims, including those based on Indian right of occupancy. Since Congress had provided a method for extinguishment, its appropriateness raised only a political,

not a justiciable, issue. The Acts of 1854 and 1870, unlike the Act of 1851, merely called for a report to Congress on certain land claims. If there was an extinguishment of the rights of the Walapais, it resulted not from action of the Surveyor General but from action of Congress based on his reports.[6] We are not advised that Congress took any such action. In its absence we must conclude that these Acts were concerned not with the problem of ascertaining the boundaries of Indian country but with the problem of quieting titles originating under Spanish or Mexican grants. For it should be noticed that § 8 of the 1854 Act contemplated confirmation by Congress of *"bona fide* grants."

This brings us to the Act of March 3, 1865, 13 Stat. 541, 559, which provided: "All that part of the public domain in the Territory of Arizona, lying west of a direct line from Half-Way Bend to Corner Rock on the Colorado River, containing about seventy-five thousand acres of land, shall be set apart for an Indian reservation for the Indians of said river and its tributaries." It is plain that the Indians referred to included the Walapais. The suggestion for removing various Indian tribes in this area to a reservation apparently originated with a former Indian agent, Superintendent Poston, who was a Territorial Representative in Congress in 1865. His explanation [7] on the floor of the

---

[6] The various reports of the Surveyor General are found in the annual reports of the Secretary of the Interior from 1855 through 1890, when the Court of Private Land Claims was constituted. Act of March 3, 1891, 26 Stat. 854. Sec. 15 of that Act repealed § 8 of the Act of 1854. Under § 13 of the 1891 Act it was provided: "No claim shall be allowed that shall interfere with or overthrow any just and unextinguished Indian title or right to any land or place."

[7] Cong. Globe, 38th Cong., 2d Sess., March 2, 1865, p. 1320: "As superintendent of Indian affairs, I called the confederated tribes of the Colorado in council together. The council was attended by the principal chiefs and headmen of the Yumas, Mojaves, Yapapais, Hualapais, and Chemihuevis. These tribes have an aggregate of ten thousand

House of the bill, which resulted in the creation of the 1865 reservation, indicates that he had called a council of the confederated tribes of the Colorado, including the Walapais, and had told them that "they should abandon" their lands and confine themselves to the place on the Colorado river which was later proposed for a reservation. He entered into no agreement with them nor did he propose a treaty. He merely stated that if elected to Congress he would try to get Congress to provide for them. As stated by the Commissioner of Indian Affairs in 1864, "Assuming that the Indians have a right of some kind to the soil, Mr. Poston's arrangement proposes a compromise with these Indians, by which on their confining themselves to their reservation, and yielding all claims to lands beyond it, they shall, in lieu of an annuity in money or supplies,

---

souls living near the banks of the Colorado, from Fort Yuma to Fort Mojave. . . .

"But as the representative of the Government of the United States at that time, I did not undertake to make a written treaty with these Indians, because I considered that the Government was able and willing to treat them fairly and honestly without entering into the form of a written treaty, which has been heretofore so severely criticised in both Houses of Congress, and with some reason. These Indians there assembled were willing, for a small amount of beef and flour, to have signed any treaty which it had been my pleasure to write. I simply proposed to them that for all the one hundred and twenty thousand square miles, full of mines and rich enough to pay the public debt of the United States, they should abandon that Territory and confine themselves to the elbow in the Colorado river, not more than seventy-five thousand acres. But I did not enter into any obligation on account of the United States to furnish them with seeds and agricultural implements. I simply told them that if I was elected to represent that Territory in this Congress, I would endeavor to lay their claims before the Government, which they understood to be magnanimous, and that I hoped that this Congress would have the generosity and the justice to provide for these Indians, who have been robbed of their lands and their means of subsistence, and that they may be allowed to live there where they have always made their homes. They desire to live as do the Pueblo Indians of New Mexico and

be furnished by government with an irrigating canal, at a cost estimated at something near $100,000, which, by insuring them their annual crops, will enable them to support themselves, independently of other aid by the government." [8]

We search the public records in vain for any clear and plain indication that Congress in creating the Colorado River reservation was doing more than making an offer to the Indians, including the Walapais, which it was hoped would be accepted as a compromise of a troublesome question. We find no indication that Congress by creating that reservation intended to extinguish all of the rights which the Walapais had in their ancestral home.[9] That

---

Arizona. Those Pueblo Indians live in settlements, in towns, in reservations, according to the wise policy of the Spanish Government, which colonized the Indians in reservations and made their labor valuable in building improvements for their own sustenance, for churches, and public improvements, and in that manner made them peaceable Indians, instead of having everlasting and eternal war with the people whom they had robbed of their land.

"These people having been citizens of the Mexican Government, are not, according to our theory, entitled to any right in the soil; and therefore no treaty with these Indians for the extinction of their title to the soil would be recognized by this Government. It is a fiction of law which these Indians, in their ignorance, are not able to understand. They cannot see why the Indians of the Northeast have been paid annuities since the foundation of this Government for the extinction of their title, while the Indians who were formerly subject to the Spanish and Mexican Governments are driven from their lands without a dollar. It is impossible for these simple-minded people to understand this sophistry. They consider themselves just as much entitled to the land which their ancestors inhabited before ours landed on Plymouth Rock as the Indians of the Northeast. They have never signed any treaty relinquishing their right to the public domain."

[8] Report of the Secretary of the Interior, Dec. 5, 1864, p. 165.

[9] Respondent also places some stress on the Act of April 20, 1871, 17 Stat. 19, in which Congress permitted respondent's predecessor to mortgage its property. But as stated in *Leavenworth, L. & G. R. Co.* v. *United States,* 92 U. S. 733, 753, "... title to lands is not strengthened

Congress could have effected such an extinguishment is not doubted. But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards. As stated in *Choate* v. *Trapp,* 224 U. S. 665, 675, the rule of construction recognized without exception for over a century has been that "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." And see *Minnesota* v. *Hitchcock,* 185 U. S. 373, 395–396. Nor was there any plain intent or agreement on the part of the Walapais to abandon their ancestral lands if Congress would create a reservation. Furthermore, the Walapais did not accept the offer which Congress had tendered. In 1874 they were, however, forcibly removed to the Colorado River reservation on order from the Indian Department.[10] But they left it in a body the next year.[11] And it was decided "to allow them to remain in their old range during good behavior." [12] They did thereafter remain in their old country and en-

by giving a mortgage upon them; nor can the fact that it has been given throw any light upon the prior estate of the mortgagor." And see *Atlantic & Pacific R. Co.* v. *Mingus,* 165 U. S. 413, 430, where this Court in speaking of the purpose of the Act of April 20, 1871, said: "The original act being silent upon the subject of mortgaging the grant, there is reason to suppose that Congress passed the act for the purpose of resolving any doubts that capitalists may have entertained with respect to such power. The mortgagees, standing in the place of the mortgagor, had no greater rights than it had, and must be held to have known that they were taking an estate which was defeasible upon condition broken."

[10] Walapai Papers, S. Doc. No. 273, 74th Cong., 2d Sess., pp. 96–98. Though the Walapais were at peace with the whites prior to 1866 (*id.* p. 92) the killing of their head chief by a white led to hostilities which continued for a few years. *Id.* pp. 37–94.

[11] Walapai Papers, *op. cit.,* p. 104.

[12] Walapai Papers, *op. cit.,* p. 104.

gaged in no hostilities against the whites. No further attempt was made to force them onto the Colorado River reservation, even though Congress had made various appropriations to defray the costs of locating the Arizona Indians in permanent abodes (Act of March 3, 1865, 13 Stat. 541, 559; Act of July 27, 1868, 15 Stat. 198, 219; Act of July 15, 1870, 16 Stat. 335, 357), including the Colorado River reservation. Act of March 2, 1867, 14 Stat. 492, 515; Act of May 29, 1872, 17 Stat. 165, 188. On these facts we conclude that the creation of the Colorado River reservation was, so far as the Walapais were concerned, nothing more than an abortive attempt to solve a perplexing problem. Their forcible removal in 1874 was not pursuant to any mandate of Congress. It was a high-handed endeavor to wrest from these Indians lands which Congress had never declared forfeited.[13] No forfeiture can be

---

[13] See Walapai Papers, *op. cit.*, p. 108. General Schofield reported on May 24, 1875, to the Adjutant General as follows:

"The Hualpai Indians have been our firm friends for many years, and our active allies whenever their services have been required against the hostile Apaches. In return for their fidelity they have been treated with great injustice and cruelty. They were forced to leave their homes in the mountains and go upon a reservation in the Colorado desert, where they have suffered from the extreme heat, to which they were unaccustomed, from disease, and from hunger.

"This was done in spite of the protest of the Military commanders who were familiar with the wants of these Indians and were anxious to repay by kind treatment the faithful services they had rendered. The Indians were bitterly opposed to this change, and it was only the great influence which Gen'l. Crook and Captain Byrne had acquired over them that enabled the removal to be made without war.

"The Indian Agent, having seen fit to relinquish the aid of this powerful influence, the effect was at once manifest in the return of the Hualpais to their former homes.

"I am decidedly opposed to the use of any coercive measures to force them back upon the Colorado reservation.

"The injustice and bad faith shown by the government toward the Hualpais and the Indians which Gen'l. Crook had collected upon the Verde reservation are calculated to undo as far as possible the

predicated on an unauthorized attempt to effect a forcible settlement on the reservation, unless we are to be insensitive to the high standards for fair dealing in light of which laws dealing with Indian rights have long been read. Certainly, a forced abandonment of their ancestral home was not a "voluntary cession" within the meaning of § 2 of the Act of July 27, 1866. *Atlantic & Pacific R. Co.* v. *Mingus,* 165 U. S. 413, 438–439.

The situation was, however, quite different in 1881. Between 1875 and that date there were rather continuous suggestions for settling the Walapais on some reservation.[14] In 1881 the matter came to a head. A majority of the tribe, "in council assembled," asked an officer of the United States Army in that region "to aid them and represent to the proper authorities" the following proposal:[15] "They say that in the country, over which they used to roam so free, the white men have appropriated all the water; that large numbers of cattle have been introduced and have rapidly increased during the past year or two; that in many places the water is fenced in and locked up; and they are driven from all waters. They say that the Railroad is now coming, which will require more water, and will bring more men who will take up all the small springs remaining. They urge that the following reservation be set aside for them while there is still

---

good work which Gen'l. Crook and his troops had accomplished with so much wisdom and gallantry. It is useless to attempt to disguise the fact that such treatment of the Indians is in violation of the just and humane policy prescribed by the President and a disgrace to any civilized country."

[14] Walapai Papers, *op. cit.,* pp. 113–131.

[15] Walapai Papers, *op. cit.,* pp. 134–135. For a strikingly close version of this episode as related in 1931 by a member of the Walapai tribe who was present at the conference in 1881 between the council of the tribe and the United States Army officer, see Walapai Papers, pp. 247–249.

time; that the land can never be of any great use to the Whites; that there are no mineral deposits upon it, as it has been thoroughly prospected; that there is little or no arable land; that the water is in such small quantities, and the country is so rocky and void of grass, that it would not be available for stock raising. I am credibly informed, and from my observations believe, the above facts to be true. I, therefore, earnestly recommend that the hereafter described Reservation be, at as early a date as practicable, set aside for them."

Pursuant to that recommendation, the military reservation was constituted on July 8, 1881, subject to the approval of the President.[16] The Executive Order creating the Walapai Indian Reservation was signed by President Arthur on January 4, 1883.[17] There was an indication that the Indians were satisfied with the proposed reservation.[18] A few of them thereafter lived on the reservation; many of them did not.[19] While suggestions recurred for the creation of a new and different reservation,[20] this one was not abandoned. For a long time it remained unsurveyed.[21] Cattlemen used it for grazing, and for some years the Walapais received little benefit from it.[22] But in view of all of the circumstances, we conclude that its creation at the request of the Walapais and its acceptance by them amounted to a relinquishment of any tribal claims

---

[16] Walapai Papers, *op. cit.*, pp. 135–136.

[17] Walapai Papers, *op. cit.*, p. 146. As to the validity of a reservation established by Executive Order, see *United States* v. *Midwest Oil Co.*, 236 U. S. 459. *Spalding* v. *Chandler*, 160 U. S. 394. General Indian Allotment Act of February 8, 1887, 24 Stat. 388, § 1; 34 Op. A. G. 181, 186–189.

[18] Walapai Papers, *op. cit.*, p. 136.

[19] Walapai Papers, *op. cit.*, pp. 163, 165–168, 178, 198.

[20] Walapai Papers, *op. cit.*, pp. 151, 161–165.

[21] Walapai Papers, *op. cit.*, pp. 192, 196.

[22] Walapai Papers, *op. cit.*, pp. 179, 183.

to lands [28] which they might have had outside that reservation and that that relinquishment was tantamount to an extinguishment by "voluntary cession" within the meaning of § 2 of the Act of July 27, 1866. The lands were fast being populated. The Walapais saw their old domain being preëmpted. They wanted a reservation while there was still time to get one. That solution had long seemed desirable in view of recurring tensions between the settlers and the Walapais. In view of the long standing attempt to settle the Walapais' problem by placing them on a reservation, their acceptance of this reservation must be regarded in law as the equivalent of a release of any tribal rights which they may have had in lands outside the reservation. They were in substance acquiescing in the penetration of white settlers on condition that permanent provision was made for them too. In view of this historical setting, it cannot now be fairly implied that tribal rights of the Walapais in lands outside the reservation were preserved. That would make the creation of the 1883 reservation, as an attempted solution of the violent problems created when two civilizations met in this area, illusory indeed. We must give it the definitiveness which the exigencies of that situation seem to demand. Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribal rights in lands outside the reservation and notoriously claimed by others. Cf. *Marsh* v. *Brooks,* 14 How. 513; *Shoshone Tribe* v. *United States,* 299 U. S. 476.

On January 23, 1941, the date of the filing of this petition for certiorari, respondent quitclaimed to the United States, under § 321 (b), Pt. III of the Interstate Commerce Act

---

[23] As distinguished from individual rights of occupancy, if any, as were involved in *Cramer* v. *United States, supra,* 261 U. S. 219, but which, not being in issue here, are not foreclosed or affected by the judgment in this case.

(Transportation Act of 1940, 54 Stat. 929, 954), all lands claimed by it under the Act of July 27, 1866, within the Walapai Indian Reservation. Since the decree below must stand as to the second cause of action and since by virtue of the quitclaim deeds the United States has received all the lands to which the first cause of action relates, the decree will not be reversed. It is apparent, however, that it must be modified so as to permit the accounting as respects lands in the first cause of action. It does not appear whether those lands were included in the ancestral home of the Walapais in the sense that they were in whole or in part occupied exclusively by them or whether they were lands wandered over by many tribes. As we have said, occupancy necessary to establish aboriginal possession is a question of fact. The United States is entitled to an accounting as respects any or all of the lands in the first cause of action which the Walapais did in fact occupy exclusively from time immemorial.[24] Such an accounting is not precluded by the Act of February 20, 1925, 43 Stat. 954, which authorized the Secretary of the Interior "to accept reconveyances to the Government of privately owned and State school lands and relinquishments of any valid filings, under the homestead laws, or of other valid claims within the Walapai Indian Reservation." The implication is that there may be some land within the reservation that is not subject to Indian occupancy. But that Act certainly cannot be taken as an extinguishment of any and all Indian title that did exist or as a repeal by implication of § 2 of the Act of July 27, 1866, requiring such extinguishment by "voluntary cession."

---

[24] In case of any lands in the reservation which were not part of the ancestral home of the Walapais and which had passed to the railroad under the 1866 Act, the railroad's title would antedate the creation of the reservation in 1883 and hence not be subject to the incumbrance of Indian title.

It was passed so that lands "retained for Indian purposes may be consolidated and held in a solid area so far as may be possible." [25]   Such statements by the Secretary of the Interior as that "title to the odd-numbered sections" was in the respondent [26] do not estop the United States from maintaining this suit.   For they could not deprive the Indians of their rights any more than could the unauthorized leases in *Cramer* v. *United States, supra.*

Hence, an accounting as respects such lands in the reservation which can be proved to have been occupied by the Walapais from time immemorial can be had.   To the extent that the decree below precludes such proof and accounting, it will be modified.   And as so modified, it is

*Affirmed.*

---

[25] H. Rep. No. 1446, 68th Cong., 2d Sess., p. 1.   So far as appears there were no reconveyances under that Act.   It apparently was, however, the occasion for precipitating the present litigation.

[26] *Id.*   And see Walapai Papers, *op. cit.,* pp. 320–321.