**PAI 'OHANA, an unincorporated association, Plaintiff,**

v.

**UNITED STATES of America and Bryan Harry, in his capacity as the Pacific Area Director of the National Park Service, United States Department of Interior, Defendants.**

**CV. No. 94–00094 DAE.**

United States District Court,
D. Hawai'i.

Jan. 17, 1995.

---

**682**

Carl C. Christensen, Native Hawaiian Legal Corp., Honolulu, HI, for plaintiff.

Thomas A. Helper, Asst. Elliot Enoki, Honolulu, HI, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO CERTIFY

DAVID ALAN EZRA, District Judge.

The court heard the parties' motions on December 19, 1994. Arnold L. Lum, Esq., appeared on behalf of Plaintiff Pai 'Ohana ("Pai 'Ohana"); Thomas A. Helper, Assistant United States Attorney, appeared on behalf of the United States of America and Bryan Harry ("Defendants"). After reviewing the motions and the supporting and opposing memoranda, the court GRANTS Defendants' Motion to Dismiss and for Summary Judg-

ment and DENIES Plaintiff's Motion to Certify Question to the Hawaii Supreme Court.

### BACKGROUND

Pai 'Ohana[1] brought suit in this court under the Quiet Title Act, 28 U.S.C. § 2409a, which allows an action "to adjudicate a disputed title in which the United States claims an interest." The dispute is over Pai 'Ohana's alleged rights to use and exclusively occupy 'Ai'opio, a five acre area of land located within the ahupua'a[2] of Honokohauiki, on the island of Hawaii. Pai 'Ohana asserts native Hawaiian rights of use and exclusive occupancy to 'Ai'opio. 'Ai'opio lies within the boundaries of Kaloko–Honokohau National Historical Park ("the Park"). The Park was created in 1988 pursuant to 16 U.S.C. § 396d, when the United States acquired the fee title to Honokohauiki from Robert F. Greenwell.[3] The statute which created the Park stated that it should be administered "generally in accordance with the guidelines provided in the study report entitled 'Kaloko Honokohau.'" 16 U.S.C. § 396d. The Kaloko Honokohau report states that one specific condition of the onsite management plan for the Park will include "allowing those families who now occupy leaseholds within the proposed park complex to remain on their land for a specific period of time which will be determined through negotiation." See Exhibit A, attached to Defendants' Memorandum in Support of Motion. When the United States purchased the property, Pai 'Ohana and other tenants signed Disclaimers renouncing any rights to the land. Pai 'Ohana now claims signing these Disclaimers does not constitute a waiver of their rights.

The land near 'Ai'opio fish trap has been occupied by native Hawaiians since historic times, predating western contact. See Exhibit 1, attached to Plaintiff's Memorandum in Opposition. It is disputed whether the members of the Pai 'Ohana have continually

1. Ohana is the Hawaiian word for family.

2. An ahupua'a is a division of land running from the mountains to the sea which provided a variety of resources needed for subsistence. *Palama v. Sheehan*, 50 Haw. 298, 301, 440 P.2d 95 (1968). An ahupua'a can vary in size from 100 to 100,000 acres. Melody K. MacKenzie, *Native Hawaiian Rights Handbook* 3 (1991).

3. The United States purchased the land for about $60 million dollars from private landowners; the purchase prevented the development of a hotel, marina and residential complex on the site. The park consists of portions of the ahupua'as of Honokohau, Honokohauiki, Kaloko, Kahanaiki and Kealakehe.

occupied the area of 'Ai'opio fish trap since before the Mahele of 1848[4] as they claim. Pai 'Ohana admits that its members first built a frame house at 'Ai'opio in 1980. Declaration of Malani Pai, attached to Plaintiff's Memorandum in Opposition. However, the evidence appears to be undisputed that the Pai 'Ohana lived at or near Honokohau beach, in the ahupua'a of Honokohau, which is near the 'Ai'opio fish trap, at least since before the turn of the century.[5] Furthermore, Honokohau beach was considered to be a part of 'Ai'opio fish trap by the Greenwell family, who owned the land prior to the sale in 1988 to the U.S. government. *See* Declaration of Kelly Greenwell, attached to Plaintiff's Memorandum in Opposition. The government has described 'Ai'opio fish trap as within the Kaloko–Honokohau–Kealakehe coastal area. *See* Exhibit 1 at 367, (government report), attached to Plaintiff's Memorandum in Opposition.

When the National Park Service ("NPS") took possession of the property, ten families resided near the 'Ai'opio fish trap area, most of whom were members of the Pai 'Ohana. These families were offered the choice of accepting relocation benefits of up to $5,000 per household or of signing Special Use Permits which allowed them to remain on the property for a term of five years, renewable by agreement.[6] One of the Plaintiffs, Pedro Pai, accepted $5,000 in relocation benefits and moved from the Park. William K. Pai, Jr. ("William Pai"), and his son, William D.

Mahealani Pai ("Malani Pai"), held Special Use Permits allowing them to reside in the Park until 1993.[7] When these permits expired neither was renewed. William Pai continued to reside at 'Ai'opio. When Malani Pai's home was destroyed on September 11, 1992, during Hurricane Iniki, he began dividing his time between an apartment in Kealakehe and a tent behind his father's house at 'Ai'opio.[8] However, Malani Pai still occasionally requested Special Use Permits to conduct religious services at 'Ai'opio and to lead tours of school children through the Park. These permits were always granted. Since the instant lawsuit was filed the Pai 'Ohana has continued these activities without requesting permits; the NPS states it has not interfered in these activities.

In December 1992, Plaintiffs William, Malani, and Warren Pai erected wooden barricades and began to deny Park personnel and visitors access to the 'Ai'opio area. Defendants state, and it is undisputed in Pai 'Ohana's Memorandum in Opposition, that William, Malani, and Warren Pai physically confronted people trying to enter the area and that their dogs threatened and bit rangers and visitors. In addition, at the hearing on the motion, Pai 'Ohana claimed a right of "exclusive use and occupancy," although they stated that they had never acted to exclude the Greenwell family, the previous fee owners.

In January 1994, the Park service began an effort to clean the Park. The NPS was

---

**4.** During the Mahele of 1848, the Kingdom of Hawaii awarded fee title to many of the ahupua'a in the Hawaiian Islands.

**5.** *See,* Declarations of John K. Goo Kim, III; Kaimi Goo Kim; Annie Asuncion K. Esplaguira Bailado; Mabel Agustin Pai; William D. Mahealani Pai; attached to Plaintiff's Memorandum in Opposition.

**6.** Private tenants are generally not allowed to reside in national parks. 36 C.F.R. § 2.61. Special Use Permits may be offered only if authorized by law. 36 C.F.R. § 1.16. The statute which created Kaloko–Honokohau National Park stated that the Park should be administered "generally in accordance with the guidelines provided in the Study Report entitled 'Kaloko Honokohau.'" 16 U.S.C. § 396d. Since the report suggested "allowing those families who now occupy leaseholds within the proposed park complex to remain on their land for a specific period

of time which will be determined through negotiation," Bryan Harry, Pacific Area Director for the NPS, interpreted these provisions to allow him to issue Special Use Permits to the tenants.

**7.** The Special Use Permits state: Lands and improvements thereon are owned in fee by the U.S. government. *See,* Exhibits F1–F3, attached to Defendants' Motion in Opposition to Plaintiff's Motion to Certify.

**8.** The facts are somewhat contradictory whether Malani Pai completely stopped living at 'Ai'opio after Hurricane Iniki. Pai 'Ohana claims that Malani Pai lived at Kealakehe with his fiancee and their child, while continuing to live in a tent at 'Ai'opio. The United States asserts that he "lived in a tent on the site for a time, and by December 1993, moved to an apartment in Kealakehe." *See,* Defendants' Memorandum in Support of Defendants' Motion to Dismiss. In either case, it appears that Malani Pai's residence at the Park was intermittent at best.

concerned that the 'Ai'opio area was littered with abandoned cars, scrap, lumber, boats and other items. At this time the NPS hand-delivered a letter to Malani Pai, demanding that he remove his property. Pai 'Ohana asserts that this letter was notice of eviction; Defendants state that the letter simply demanded that Malani Pai remove his property from the 'Ai'opio area, noting that he no longer resided there. Pai 'Ohana also complains that the NPS has interfered with their water supply. Pai 'Ohana obtained their water supply from a hose connected to a water spigot located at the state harbor facility.[9]

Suit was filed by Pai 'Ohana on February 4, 1994, shortly after receipt of the letter discussed above. Pai 'Ohana's Complaint alleges: (1) that their native tenant rights and individual aboriginal title to 'Ai'opio were not extinguished when the United States took possession of the Park (Count I); (2) that Defendants violated Pai 'Ohana's right of procedural due process guaranteed under the Fifth Amendment to the United States Constitution (Count II);[10] (3) that Defendants' attempt to evict Pai 'Ohana is a taking without just compensation in violation of the Fifth Amendment to the United States Constitution (Count III); and (4) that Defendants infringed upon Pai 'Ohana's property rights without due process of law, by shutting off Pai 'Ohana's water supply and by interfering with Pai 'Ohana's conduct of religious rites, in violation of the Fifth Amendment to the United States Constitution (Count IV). On August 2, 1994, Pai 'Ohana filed the instant Motion to Certify a Question to the Hawaii Supreme Court. On November 15, 1994, Defendants filed the instant Motion to Dismiss and for Summary Judgment.

## STANDARD OF REVIEW

### I. Motion to Dismiss

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A complaint should not be dismissed unless it appears to a certainty that plaintiff can prove no set of facts which would entitle the plaintiff to relief. *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832–33, 104 L.Ed.2d 338 (1989); *Fidelity Fin. Corp. v. Federal Home Loan Bank*, 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987); *Stender v. Lucky Stores, Inc.*, 766 F.Supp. 830, 831 (N.D.Cal.1991). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Stender*, 766 F.Supp. at 831.

To the extent, however, that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(c). The court may consider documents attached to the pleadings without converting the motion into one for summary judgment. *U.S. v. Wood*, 925 F.2d 1580 (7th Cir.1991) (court may examine documents incorporated by reference into the pleadings); *Homart Development Co. v. W.T. Sigman*, 868 F.2d 1556 (11th Cir.1989) (contract on which action was based considered to be part of pleadings, not outside document). More specifically, "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed.R.Civ.P. 10(c).

### II. Summary Judgment

Rule 56(c) provides that summary judgment shall be entered when:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of mate-

---

9. Defendants state they have never done anything to disturb Pai 'Ohana's water supply. Defendants believe that state harbor employees may have disconnected the hose from the spigot because these employees had previously complained about Pai 'Ohana's unauthorized and uncompensated taking of the state harbor's water.

10. Count II originally also alleged a claim for violation of the Hawaii Landlord Tenant Code, Haw.Rev.Stat. § 521–71, for defendants' failure to give forty-five (45) days notice of Malani Pai's termination of tenancy. In its Memorandum in Opposition, Pai 'Ohana withdrew any claims falling under Haw.Rev.Stat. 521–71.

rial fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* 477 U.S. at 322, 106 S.Ct. at 2552.

■ Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted).

■ At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

Because the parties have submitted, and this court has considered, matters outside the pleadings the court treats this motion as one for summary judgment.

## DISCUSSION

### I. Count I

#### A. *Reserved Rights of Use and Occupancy*

Pai 'Ohana claims that they have been tenants at 'Ai'opio since before the Great Mahele of 1848 and that therefore they have rights of use and exclusive occupancy to the land under both federal and Hawaii state law.[11] Based upon these alleged rights of use and exclusive occupancy, Pai 'Ohana claims that the government has interfered with their property rights.

Defendants argue that Pai 'Ohana has no reserved rights of use and occupancy because: (1) Defendants' predecessors in interest, the Greenwells, owned fee simple title to Honokohauiki; (2) Pai 'Ohana's predecessors failed to make a Kuleana claim to the Land Commission; and (3) Pai 'Ohana has no rights of ownership under either the Hawaii Constitution, Hawaii Statutory provisions, Hawaii case law or federal law. Therefore, Defendants argue that Pai 'Ohana has failed to state a claim of ownership upon which relief may be granted.

#### B. *Historical Background*

The court has done an extensive review of the origin and scope of native Hawaiian land rights. An overview is necessary to fully understand the historical background of this case and to explain and define certain laws, terms and concepts cited herein.

In 1846 the Hawaiian government enacted the "Principles Adopted by the Board of Commissioners to Quiet Land Titles in the Adjudication of Claims Presented to Them" ("Principles"). The Principles provided three classes of persons who possessed vested land rights: the government, the landlord, and the tenant.[12] In fulfillment of the Princi-

---

**11.** Although Pai 'Ohana's Complaint appears to assert actual ownership of part of the Park, its Memorandum in Opposition claims only rights of use and exclusive occupancy, and apparently does not dispute Defendants' fee title to the land. However, at the hearing on this matter counsel for Pai 'Ohana argued that their claim "overlapped" a claim of fee ownership and agreed that what they were claiming was the functional

equivalent of fee title to the property in question. Indeed, as indicated above, members of Pai 'Ohana have recently erected barriers on the property and are treating the property as their own.

**12.** Louis Cannelora, *The Origin of Hawaii Land Titles and of the Rights of Native Tenants* 1 (1974), at 10.

ples three measures were enacted pursuant to a plan by Chief Justice William Lee for the partition of the King's and chief's interest in the land.[13] These were: (1) The Great Mahele of 1848, Act of June 7, 1848, 2 Rev. Laws Haw. 2152–76 (1925), which separated Crown lands from "konohiki" interests;[14] (2) the Act of July 10, 1850, 2 Rev.Laws Haw. 2233, 2234 (1925), which authorized foreigners to own land in fee simple; and (3) the Kuleana Act of 1850, Act. of Aug. 6, 1850, 2 Rev.Laws Haw. 2141–42 (1925), extending for the first time the fee simple regime to commoners.

All of the lands distributed in the Great Mahele of 1848 were granted "subject to the rights of the native tenants." 2 Rev.Laws Haw. 2152 (1925). As the King, the government, and the konohiki began to sell off pieces of their lands, there were many questions and concerns about this reference, and about how best to protect and define these rights. Jon J. Chinen, *Original Land Titles in Hawaii* at 16 (1961). "To clarify [this] situation the Privy Council took the matter under consideration ... [and] [a]fter several months of discussion ... adopted four resolutions ... as a means of protecting [these] 'rights of the native tenants.'" Jon J. Chinen, *The Great Mahele: Hawaii's Land Division* at 29 (1958).[15] These four resolutions authorized the Land Commission to award fee simple titles to all native tenants who had occupied and improved the land. The resolutions were confirmed by the Act of August 6, 1850 (the Kuleana Act). "The awarding of these kuleanas to the native tenants completed the mahele, or division, of the lands within the Islands into Crown Lands, Government Lands, Konohiki Lands, and Kuleana Lands,

and brought to an end the ancient system of land tenure in the Hawaiian Kingdom." *Id.* at 31. This provision was also clarified by the Hawaii Supreme Court, in *McBryde Sugar Co. v. Robinson*, 55 Haw. 260, 286, 517 P.2d 26 (1973) *cert. denied* 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 and 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974):

> Events made it clear, however, that the phrase 'rights of tenants' was not self-explanatory, and that legislation was needed to define hoaaina[16] rights with greater particularity.... (citation omitted). As a result of their deliberations ... the Privy Council adopted four resolutions which were enacted by the Legislature as the first four sections of the Enactment of Further Principles on August 6, 1850. These four sections, together with sections 5 and 6 passed by the Legislature on August 15, 1850, afforded hoaainas the private ownership of those parcels of land which they had traditionally dwelled upon and cultivated, and also established procedures by which hoaainas could receive allodial title to their kuleanas by way of grants from the Land Commission.

*McBryde* 55 Haw. at 286, 517 P.2d 26 (Levinson, J., dissenting).

The Kuleana Act provided that to obtain the land, the tenant had to confirm his claim with the Board of Commissioners to Quiet Land Title (the "Land Commission"). However, the Kuleana Act stated that Kuleana awards were free of the commutation fee to which the other Mahele lands were subject. The owner of the ahupua'a or ili kupono,[17] from which the Kuleana land was taken, was required to pay the commutation. Chinen, *The Great Mahele*, at 30; *See* Act of Aug. 6.

---

13. William Lee was not only Chief Justice of the Supreme Court of Law and Equity but also a member of the Land Commission. *See,* Linda S. Parker, *Native American Estate: The Struggle Over Indian and Hawaiian Lands* 114 (1989).

14. Konohiki originally referred to a land agent appointed by a superior chief. However, in time, the term was extended to include the chiefs or landlords. *Territory v. Bishop Trust Co.,* 41 Haw. 358, 361–62 (1956).

15. *See, Privy Council Records,* vol. III, p. 384. The discussion continued thereafter on November 27, December 12, 20, 21, 1849. *Privy Coun-*

cil Records, vol. III, pp. 404, 411–12, 415, and 417–419.

16. Hoaaina is defined as "tenant." Chinen, *Original Land Titles in Hawaii* (1971). The *Native Hawaiian Rights Handbook* further defines the term as: tenant, caretaker, occupant, as on a *kuleana.* Melody Kapilialoha MacKenzie, *Native Hawaiian Rights Handbook* (1991).

17. An ili kupono is a unit of land under the ancient Hawaii land system which is next in size to the ahupua'a. A Kuleana was generally a smaller parcel of land taken from an ili. Reilly, *The Language of Real Estate in Hawaii,* 163 (1975).

1850, 2 Rev.Laws Haw. 2141–42.[18] When the Royal Patent commutation fee was paid, the claimant, whether konohiki or former tenant, was entitled to receive fee simple title to the land. *See generally, Thurston v. Bishop,* 7 Haw. 421, 430 (1888). Since the owner of the ahupua'a or ili kupono was required to pay the commutation fee, the reversionary interest of the Kuleana escheated to the owner, rather than the government, as was true of the other land awards during the Great Mahele. Chinen, *The Great Mahele* at 30. Until its dissolution in March 1855, the Land Commission issued thousands of Kuleana awards to the former native tenants. *Id.* at 31.

The awards issued by the Land Commission, whether for konohiki, resident alien, or Kuleana title, identified the nature of the title conferred, as being either a leasehold or a fee simple interest. Chinen, *The Great Mahele* at 13. "Except for the government's right of commutation, a Land Commission Award gave complete title to the lands." *Id.* When the commutation was satisfied, a Royal Patent upon the Award was issued. "A Royal Patent issued upon a Land Commission Award did not confer or confirm title. It merely quitclaimed the government's interest in the land. It was evidence that the government's right to commutation had been extinguished. And all the presumptions have been held in favor of the validity of a patent." *Id.* at 14.[19] Moreover, even if the holder of a Land Commission Award failed to apply for a Royal Patent, providing the original award had not been appealed from within ninety days of issuance, it was still considered "good and sufficient title ... and shall furnish as good and sufficient a ground upon which to maintain an action for trespass, ejectment, or other real action ... as if the claimant ... had received a Royal Patent." *Davis v.*

*Brewer,* 3 Haw. 270 (1871); Act of August 10, 1854; *See also,* Chinen, *The Great Mahele* at 14.

When the Land Commission was established in 1845, it provided:

All claims to land, as against the Hawaiian Government, which are not presented to [the Land Commission] within the time, at the place and in the manner prescribed in the notice required to be given by the fifth section of this article, shall be deemed invalid, and shall be forever barred in law unless the claimant be absent from the Kingdom and have no representative therein.

2 Rev.Laws Haw. at 2123 (1925). The Principles adopted by the Land Commission and given the force of law by the Legislative Council embodied this same policy. Act of October 26, 2 Rev.Laws Haw. 2137, (1925). The ability to confirm a claim was foreclosed by the Act of May 26, 1853, which states that claimants "who shall not have appeared before the said Board and proved their several claims, previous to the first day of May, A.D. 1854, shall be forever barred from proving the same...." 2 Rev.Laws Haw. 2145 (1925).[20]

Today, native Hawaiian tenant rights derive from three sources: article XII, section 7 of the Hawaii Constitution, Hawaii Revised Statutes section 7–1, and Hawaii Revised Statutes section 1–1. Article XII, section 7 of the state constitution discusses customary and traditional rights in a general manner.[21] It states: "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Is-

---

**18.** This was not true of Kuleana awards of houselots in Honolulu, Lahaina, and Hilo, which were subject to the commutation fee (although a lesser fee). This was because these lots were not within any ahupua'a or ili kupono whose chief was deemed responsible for the commutation. Chinen, *The Great Mahele* at 30 (1958) (citing *Keeliokalani v. Robinson,* 2 Hawaii 522 (1860); *Kanaina v. Long,* 3 Hawaii 335 (1872) (further citations omitted)).

**19.** *See also, Laanui v. Puohu,* 2 Hawaii 161 (1850); *Davis v. Brewer,* 3 Haw. 270 (1871); 3 Hawaii 359 (1872); *Brunz v. Smith,* 3 Haw. 783

(1877); *Greenwell v. Paris,* 6 Haw. 315 (1882); *Mist v. Kawelo,* 11 Haw. 587 (1898).

**20.** This date was extended from time to time by subsequent legislative enactments. Similarly, the Land Commission was originally intended to exist for only two years, but statutes were enacted extending its tenure until March 31, 1855, the date it was dissolved. Chinen, *The Great Mahele* at 13.

**21.** Article XII, section 7 was added during the Constitutional Convention of 1978 and ratified in the November 7, 1978, general election. *See* Haw. Const. art. XII, § 7.

lands prior to 1778, subject to the right of the State to regulate such rights." Haw. Const. art. XII, § 7.

Hawaii Revised Statutes section 7–1 recites the specific rights of native tenants listed in section 7 of the Kuleana Act of 1850, as amended in 1851:

Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; and provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use.

Haw.Rev.Stat. § 7–1 (1985). The Hawaii Supreme Court has stated that native Hawaiian rights are not necessarily limited to those rights enumerated above; Haw.Rev.Stat. § 1–1 "may establish certain customary Hawaiian rights beyond those found in [Haw. Rev.Stat.] § 7–1." *Pele Defense Fund v. Paty,* 73 Haw. 578, 618, 837 P.2d 1247 (1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1977) (citing *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 9–10, 656 P.2d 745 (1982)). Pele narrowly held that "native Hawaiian rights protected by article XII, § 7 may extend beyond the ahupua'a in which a native Hawaiian resides where such rights

have been customarily and traditionally exercised in this manner." *Pele,* 73 Haw. at 620, 837 P.2d 1247.

Hawaii Revised Statutes section 1–1 codifies Hawaiian usage as an exception to the English Common law of the State of Hawaii:

The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as ... established by Hawaiian usage; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

Haw.Rev.Stat. § 1–1 (1985). The Hawaiian usage clause relates to usage which predated November 25, 1892, the date the law was approved. *State v. Zimring,* 52 Haw. 472, 479, 479 P.2d 202 (1970).[22]

C. *Rights Reserved in the Original Patent to the Land in Question*

■ It is undisputed that William Pitt Leleiohoku ("Leleiohoku"), the first owner of 'Ai'opio, obtained a valid award of Honokohauiki from the Land Commission in 1855. This grant, No. 9971, similar to all grants of land during the Great Mahele, provided that Leleiohoku's award was subject to "the rights of the native tenants within."[23] Exhibit A, Plaintiff's Certification Memorandum. Pai 'Ohana claims that Leleiohoku never got anything more than this "less than fee simple" grant, which was always subject to the reserved rights of the native tenants. Pai 'Ohana concedes that Leleiohoku's Royal Patent of 1877 vested him with fee title to the ahupua'a, but nonetheless argues that it did not extinguish Pai 'Ohana's rights of use

22. For further discussion of the historical development of native Hawaiian tenant access and gathering rights, see Gina M. Watumull, Note, *Pele Defense Fund v. Paty: Exacerbating the Inherent Conflict between Hawaiian Native Tenant Access and Gathering Rights and Western Property Rights,* 16 U.Haw.L.Rev. (forthcoming Summer 1995).

23. Pai 'Ohana has attached a barely legible copy of Leleiohoku's 1855 award to Honokohauiki, which appears to state, in Hawaiian: "Koe nae no kuleana o na kanaka maloko." *See,* Exhibit A, Plaintiff's Motion to Certify. Pai 'Ohana's translator has translated this to mean: "Reserv-

ing however the rights of the Native Tenants within." Defendants make no objection to this translation. However, this court notes that the Hawaii Supreme Court, in *Kalipi v. Hawaiian Trust Co., Ltd.,* 66 Haw. 1, 12, 656 P.2d 745 (1978) accepted a translation of this same phrase to mean "the *kuleanas* of the people therein are excepted." (emphasis added). Kalipi actually owned Kuleana lots within the ahupua'a where he sought to gather, and based his alleged right of access and gathering, upon three sources: (1) Haw.Rev.Stat. § 7–1; (2) Haw.Rev.Stat. § 1–1; and (3) the explicit reservations found in his original Kuleana land titles. *Kalipi,* 66 Haw. at 4, 656 P.2d 745.

and exclusive occupancy, which were reserved in the earlier 1855 Land Commission grant. Pai 'Ohana claims that the 1877 patent had the effect of a quitclaim only against the government's interest in the land and that the reserved rights of the native tenants within were undisturbed. Therefore, Pai 'Ohana argues that when Leleiohoku sold his interest to Frank Greenwell it was subject to the reserved rights of the native tenants within, and that these rights ran with the land when the Greenwell family sold their interest to the United States.[24]

First, as noted above, except for the government's right of commutation, an award by the Land Commission gave complete title to the lands confirmed. Chinen, *The Great Mahele* at 13. Second, turning to the Royal Patent, awarded to Leleiohoku in 1877, which perfected Leleiohoku's 1855 grant, the plain reading of the document establishes that Leleiohoku was awarded "absolutely, in fee simple . . . all that certain piece of Land or Ahupuaa known as Honokohauiki." Exhibit B attached to Plaintiff's Certification Memorandum. Moreover, the Royal Patent expressly awards a fee simple grant to Leleiohoku and his "heirs and assigns forever." *Id.* The only restrictions to the fee simple status of the Patent award were for taxes and "excepting and reserving to the Hawaiian Government all mineral or metalling mines of every description." *Id.* Significantly, there is no reservation of rights in favor of "native tenants" in the Royal Patent issued to Leleiohoku by the Hawaiian government.

Third, and most important, the Kuleana Act was expressly enacted to address the growing concerns over the provision "rights of the native tenants" that was found in all land grants pursuant to the Mahele. Chinen, *Original Land Titles in Hawaii* at 16; *McBryde Sugar Co. v. Robinson*, 55 Haw. 260, 286, 517 P.2d 26 (1973), *cert. denied,* 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 and 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). "As the owners of the various lands

began to sell . . . their lands, there was much concern about the protection of these rights of the native tenants . . . [a]nd after much discussion of the matter in the Privy Council and the Legislature, on August 6, 1850, the Legislature . . . authorized the Land Commission to award to native tenants fee simple titles covering the lands lying within any Crown, government or Konohiki Lands which they actually occupied and which they had improved." Chinen, *Original Land Titles in Hawaii* at 16. Therefore, to protect these "rights of the native tenants," the Hawaiian monarchy granted, for the first time, any tenant who had improved the land upon which he lived, the right to obtain title to it. *See* Act of Aug. 6, 1850, 2 Rev.Laws Haw. 2141–42 (1925). This was Pai 'Ohana's ancestors' opportunity to lay claim to the land. It is undisputed that they did not do so and that another native Hawaiian, Leleiohoku, did.

Pai 'Ohana cites *Brunz v. Smith,* 3 Haw. 783, 787–88 (1877), and its progeny in support of its argument that the Royal Patent at issue here did not extinguish the rights reserved in the original Land Commission grant. *Brunz* states that the "effect of [a] patent is to relinquish the government's interest in the area" as to the original holder. *Brunz,* 3 Haw. at 788. *Brunz* further states that a patent based upon a previous Land Commission Award neither "confer[s] or confirm[s] titles." *Id.* at 787; *Mist v. Kawelo,* 11 Haw. 587, 589 (1898). However, *Brunz* also states:

'the well being of [the kingdom of Hawaii] must essentially depend upon the proper development of their internal resources of which land is the principal, and that in order to its proper cultivation and improvement the holder must have some stake in it more solid than the bare permission to evolve his daily bread from an article to which he and his children can lay no intrinsic claim. . . . The Commissioners must infer that *His Majesty intended the utmost liberality to prevail towards the*

---

**24.** In effect it is Pai 'Ohana's contention that when Leleiohoku received fee title to the property in 1855, a fact which is undisputed, he in fact received only a worthless piece of paper from the Hawaiian government, since according to Pai 'Ohana their ancestors retained the exclusive right of occupancy, the equivalent to fee title, over the land that the patent to Leleiohoku's patent conveyed to him.

*claimants, rather against the interests of the body politic, than against those of the claimants'* (citation omitted) (emphasis added). Such being the spirit and the controlling principles at the foundation of these grants ... we may well construe the provision in the award and the corresponding statute, favorably to securing 'permanent' titles.

*It must have been contemplated that the original parcels of land would in no long time be subject to division by partition among heirs, and by sales, which for the first time in Hawaiian history a common man had the power to make, and we can hardly suppose that it was meant that the right to acquire complete title should depend in its exercise upon the concurrence of other owners in the same tract, a condition which would often practically destroy the right.*

*Brunz v. Smith,* 3 Haw. at 786 (emphasis added). Thus, while it may be true that the Royal Patent's effect was only as a quitclaim to the government's allodial rights, it is also true that the original purpose of the Land Commission was to make permanent and absolute the original grants to the exclusion of other claims. It would be inconsistent with the stated purpose of the Kuleana Act and the Principles themselves to suppose that the land was to be given in fee simple to the holder of the Royal Patent, yet always subject to the continued exclusive tenancy or occupancy of whomever was upon the land at the time of the Great Mahele. This is particularly true because the rights of the native tenants were expressly addressed by the Kuleana Act, the purpose of which was to resolve and legally define these native tenants' interests. Any other interpretation would render both the Land Commission, the Kuleana Act, and the Patent award process of the Hawaiian Kingdom a futile and nonsensical exercise.

Moreover, the court again notes that all lands awarded during the Great Mahele contained the express reservation "Koe no Kuleana o Kanaka," reserving the rights of the "native tenants who held kuleana lands within the ahupuaas." *Palama v. Sheehan,* 50 Haw. 298, 299, 440 P.2d 95 (1968) (Kuleana

owners entitled to right-of-way based on ancient Hawaiian right of reasonable necessity); *See also, Kalipi v. Hawaiian Trust Co.,* 66 Haw 1, 4, 656 P.2d 745 (1982). The *Palama* court interpreted this phrase to mean that "the rights of native tenants as *owners of Kuleana lands*" were set forth in the Kuleana Act (emphasis added). *Id.* It is undisputed that Pai 'Ohana did not own Kuleana title to 'Ai'opio. Moreover, it is undisputed that the fee owner of the lands in question here was first Leleiohoku, then Frank Greenwell, and now the United States.

Therefore, based upon the history of the Mahele, and in particular the reasons set forth for the enactment of the Kuleana Act, the court finds that the restriction in Leleiohoku's original land award, No. 9971, did not include the permanent right of use and exclusive occupancy that Pai 'Ohana attempts to argue.

### D. *Pai 'Ohana's Alleged Rights of Use and Occupancy under Hawaii Law to the Land in Question*

■ Pai 'Ohana claims that under Hawaii statutory and case law they have a reserved right of exclusive use and occupancy, although they admit that they do not possess Kuleana title to the 'Ai'opio area. Defendants vigorously assert that Pai 'Ohana's claims are barred by the failure of Pai 'Ohana's ancestors to properly claim Kuleana title under the laws of the Hawaiian Kingdom.

#### 1. Under Hawaii Case Law

This court cannot find, and Pai 'Ohana has not cited, any Hawaii case supporting its claim. As noted above in Part I §§ B and C, the only way for a native tenant to claim fee simple ownership of land after the Mahele was to apply for a Kuleana title with the Land Commission. The Hawaii Supreme Court has consistently and without exception held that a tenant who failed to do so was barred from claiming ownership. *See Kahoomana v. Minister of Interior,* 3 Haw. 635 (1875) (failure of plaintiff to claim award of land with the Land Commission within allotted time barred the claim; the land therefore remained with the government against whom a claim of adverse possession will not lie);

*Kenoa v. Meek*, 6 Haw. 63 (1871) (a konohiki grantee under the Mahele who failed to perfect his title is barred from asserting it); *Thurston v. Bishop*, 7 Haw. 421 (1888) (failure to present claim within allotted time barred claimant and land remained with government).

Hawaii case law holds that native tenants cannot claim a right to ownership through continuous occupation. *Dowsett v. Maukeala*, 10 Haw. 166 (1895). In *Dowsett*, the Hawaii Supreme Court unambiguously stated: "If the Land Commission expired and the hoaainas or native tenants neglected to present their claims for the parcels which they desired and for which they would ordinarily be awarded Kuleana title, showing merely their occupation of the same as a foundation for it, we think they must be considered as content with their prior status as tenants *by permission of the land owner*." *Id.* at 169 (emphasis added); *see also, Maikai v. A. Hastings and Co.*, 5 Haw. 133 (1884) (cited for the proposition that petitioners who are not Kuleana holders are "hoaainas or tenants at sufferance under the Konohiki").

Thus, *Dowsett* denied a claim for adverse possession based upon plaintiff's long-standing tenure upon the land, stating:

> To say that the old tenancy by will of the chief or konohiki became an adverse holding as soon as the chief or konohiki received his title to the land, and this without notice on the tenant's part that he held henceforth adversely, would give such person holding thereafter for twenty years, to all intents and purposes, as perfect a title to the land he held as if he had applied for and received a fee simple title therefor, and he thus be saved the expense of procuring such title. *The law did not intend thus to favor those who slept upon their rights.*

*Id.* at 171 (emphasis added).

Pai 'Ohana attempts to distinguish *Dowsett* and other Hawaii Supreme Court cases by arguing that none of them addressed reserved rights or claims of use and occupancy, only fee simple claims. Therefore, Pai 'Ohana claims that these cases are not controlling.

The flaw in this argument is that Pai 'Ohana cannot cite any case where the "reserved rights of use and occupancy" of native tenants without Kuleana title is recognized as a separate bundle of rights against fee simple owners holding title pursuant to a Land Commission Award.

Moreover, the court notes that *Dowsett* does in fact address native rights of use and occupancy, although it may not specifically use the term. As with the Pai 'Ohana, the defendants in *Dowsett* "thought they had a right to the land because they had lived on it so long." *Dowsett*, 10 Haw. at 169. *Dowsett* expressly held they did not. In *Dowsett*, the defendants attempted to assert a claim of adverse possession to the land based upon their lengthy tenancy. Because their tenure had been permissive their claim of adverse possession was defeated. In so holding, the court analyzed the rights remaining to native tenants, and held that subject to its decision in *Oni v. Meek*, 2 Haw. 87 (1858), the Kuleana Act repealed the "ancient tenure, but in the 7th section preserved to the people, whether hoaainas by ancient custom or kuleana holders, certain specific rights, as to take firewood, house timber, thatch, etc. for their own use." *Dowsett*, 10 Haw. at 170.

*Dowsett* also held that the "specific rights on an ahupuaa must be confined to those who have lawful right to reside there, whether upon kuleanas or by the will of the owner." *Id.* at 171. The court stated that a "lawful occupier is one having "some title, whether by being the holder of a kuleana or having purchased a portion of the ahupuaa, ... or by some other lawful tenure.... if the hoaaina, without paper title by kuleana, remains on the land after his permissive occupancy has ceased either by notice to quit or by his own act of refusing to attorn, he cannot be considered as being a 'lawful occupier' and entitled to the specific rights of the people above set forth." *Id.* at 170–71.

Pai 'Ohana acknowledges that *Dowsett* is still good law. However, it asks this court to consider more recent decisions, particularly those of the Hawaii Supreme Court under

Chief Justice Richardson,[25] and to conclude that because *Dowsett* "was decided during an era when the Hawaii courts were bent upon conforming Hawaiian law to western property concepts," (citation omitted) it "should therefore be reviewed in a different light today." Plaintiff's Memorandum in Opposition, at 19.

However, in *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 656 P.2d 745 (1982), the Richardson Court, cited by Pai 'Ohana for its "activist polic[ies] of affirming the rights of native tenants,"[26] held that native tenant rights of access and gathering did not extend beyond the ahupua'a of residence and refused to abolish the ahupua'a residency requirement. The court based its holding upon analysis of Haw.Rev.Stat. §§ 7–1 and 1–1 and the explicit reservations in Kalipi's original Kuleana land titles. Moreover, the Richardson Court's rationale in *Kalipi* was to harmonize and balance western property law and the traditional Hawaiian concern for other residents, with the guaranteed rights of access and gathering found in Haw.Rev.Stat. §§ 1–1 and 7–1. *Id.* at 7–8, 656 P.2d 745. Therefore, *Kalipi* unequivocally stated that any such rights could only be exercised on undeveloped land, and that even if these practices are long established, the Hawaiian usage exception in Haw.Rev.Stat. § 1–1 insures their continuance for only so long as "no actual harm is done thereby." *Id.* at 10, 656 P.2d 745.

The recent Hawaii Supreme Court case, *Pele Defense Fund v. Paty,* 73 Haw. 578, 837 P.2d 1247 (1992), cited the *Kalipi* decision for precedent in its landmark holding that native Hawaiian rights protected under the constitution of Hawaii "may extend beyond the ahupua'a in which a native Hawaiian resides." *Id.* at 620, 837 P.2d 1247. While *Pele* attempted to further define the scope of native Hawaiian rights protected by article XII, § 7, commonly termed "Kalipi rights," the court in no way suggested that the customary rights of native Hawaiians extended

to actual fee simple title or the equivalent exclusive use and possession of land to which the native Hawaiian has no legal claim of ownership. While it is true that *Pele* states that the drafters of article XII, § 7 did not intend for the provision to be narrowly construed, and emphasized that all native Hawaiian tenant rights were reaffirmed by the amendment, it is also true that *Pele* held that all other requirements of *Kalipi* must also be met. *Id.* at 621, 837 P.2d 1247. First, both *Pele* and *Kalipi* guarantee access to undeveloped land only, and only so far as "no actual harm is done." *Kalipi,* 66 Haw. at 10, 656 P.2d 745; *Pele,* 73 Haw. at 621, n. 36, 837 P.2d 1247. Second, "[t]he precise nature and scope of rights retained by § 1–1 would, of course, depend upon the particular circumstances of each case." *Kalipi,* 66 Haw. at 12, 656 P.2d 745. And third, these other requirements would presumably also include *Kalipi's* balancing of western property interests with the rights of native tenants. Therefore, *Pele* does not support Pai 'Ohana's argument that native Hawaiian tenant rights include the right of use and exclusive possession to land owned by another.

On the one hand, Pai 'Ohana states it is not claiming a right of fee simple ownership of 'Ai'opio. Pai 'Ohana concedes that it does not own fee title to the land, that in fact the fee title rests in Defendant United States. Pai 'Ohana states that its claim is in the "nature of possessory rights to use and occupy the land, subject only to abandonment or the ultimate power of the sovereign to extinguish them." Plaintiff's Memorandum in Opposition at 2. On the other hand, at the hearing on the motion, Pai 'Ohana asserted that its right to 'Ai'opio is exclusive and permanent, conceding that this is the functional equivalent to fee title.

In other words, Pai 'Ohana is claiming, as Defendants allege, the right of perpetual and exclusive use and occupancy. The court cannot discern the practical difference between

---

**25.** Pai 'Ohana states that "the Hawaii Supreme Court has recently reembraced the Richardson Court's activist policy of affirming the rights of native tenants, particularly in regard to rights of use and access on undeveloped lands that were patented during the Mahele." *See,* Plaintiff's

Memorandum in Support of Certification at 13–15.

**26.** Plaintiff's Memorandum in Support of Motion to Certify at 15.

this alleged right and a claim of fee title to 'Ai'opio, other than one of semantics. This is particularly true in light of the fact that Pai 'Ohana has not only erected barricades and refused Park visitors and employees entrance to the area, but has stated that its right to 'Ai'opio is exclusive. Pai 'Ohana's Complaint requests that this court declare the 'Ohana the sole owners of 'Ai'opio and that Defendant United States "be declared to have no interest whatsoever in 'Ai'opio." Complaint at 9. Therefore, Pai 'Ohana does indeed seek the functional equivalent of fee simple title in the land.[27]

■ Moreover, to assert jurisdiction under the Quiet Title Act a plaintiff must establish what, if any, title they have in the land that the United States claims an interest. *Younce v. United States,* 661 F.Supp. 482 (W.D.N.C.1987) *aff'd* 856 F.2d 188 (1988). To come within the class of beneficiaries envisioned by 28 U.S.C. § 2409a, which was enacted to allow the United States to be made a party in actions to quiet title to lands in which the government claims an interest, a plaintiff must have title or color of title to the land in which the United States also claims an interest. *Claxton v. Small Business Administration of United States Government,* 525 F.Supp. 777 (D.C.Ga.1981). The word "title" as used in 28 U.S.C. § 2409a connotes an ownership interest. *Landow v. Carmen,* 555 F.Supp. 195 (D.Md.1983). Pai 'Ohana stated at the hearing that they claimed a right of title under the doctrine of aboriginal title, which this court will construe as the functional equivalent of fee title. If they do not claim a right of title, then Defendants' Motion for Dismissal must be granted as to

claims dependent on this court's jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a.

Whether they claim a fee simple interest or the more ephemeral, though no less permanent or exclusive, "right to use and occupy," Pai 'Ohana's claim fails under well established Hawaii case law. They cannot have the right of permanent occupancy to the exclusion of others without having the equivalent of fee simple title. In the more than 147 years since the Great Mahele, an absolute and exclusive right of use and occupancy as alleged by Plaintiff has never been accepted by any court of the Hawaiian Kingdom, Republic, Territory, or State. Therefore, this court finds that Hawaii case law will not support the right of use and exclusive occupancy as alleged by Plaintiffs.[28]

### 2. Under Hawaii Statutory and Constitutional Law

Pai 'Ohana asserts that Haw.Rev.Stat. § 7-1, which preserves native Hawaiian rights of gathering and access should be read in conjunction with Haw.Rev.Stat. § 1-1 for a more expansive interpretation of what customary rights of Hawaiian usage exist. Pai 'Ohana contends that native Hawaiian rights are not limited solely to access and gathering. Pai 'Ohana relies on *Pele Defense Fund v. Paty,* 73 Haw. 578, 620, 837 P.2d 1247 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993), which states that Haw.Rev.Stat. § 1-1's "Hawaiian usage" clause "may establish certain customary Hawaiian rights beyond those found in [Haw. Rev.Stat.] § 7-1." (citing *Kalipi v. Hawaiian*

---

**27.** A fee simple estate creates "an absolute estate in devisee ... limited absolutely to a person and his or her heirs and assigns forever without limitation or condition. An absolute or fee-simple estate is one in which the owner is entitled to the entire property, with unconditional power of disposition during one's life, and descending to one's heirs and legal representatives upon one's death intestate.... The word 'fee' used alone, is a sufficient designation of this species of estate, and hence 'simple' is not a necessary part of the title, but is added as a means of clearly distinguishing this estate from a fee-tail or from any variety of *conditional estates. Fee-simple signi*fies a true fee." Black's Law Dictionary, 6th ed. (1990).

**28.** While Pai 'Ohana has carefully refrained from explicitly arguing a claim for adverse possession the court notes that what they are seeking is also the functional equivalent of adverse possession. To prove title by adverse possession in Hawaii a claimant must show the "necessary elements, namely, actual, open, notorious, continuous and exclusive possession for the statutory period." *Lai v. Kukahiko,* 58 Haw. 362, 368, 569 P.2d 352 (1977). The court notes that Pai 'Ohana could not meet this test with regard to 'Ai'opio. Nor is it possible to gain title to land belonging to the United States through adverse possession. *United States v. Pappas,* 814 F.2d 1342 (9th Cir.1987).

*Trust Co.,* 66 Haw. 1, 9, 656 P.2d 745 (1982)).[29]

Haw.Rev.Stat. § 7–1 (1976) gives those who have "allodial title" to land the right to go onto other lands to exercise certain rights, specifically: "gathering rights which are specifically limited and enumerated, and rights to access and water which are framed in general terms." *Kalipi,* 66 Haw. 1, 5, 656 P.2d 745 (1978). *Kalipi* further stated that Haw.Rev.Stat. § 1–1 ensures the continuation of other native Hawaiian customs and traditions not specifically enumerated in Haw.Rev.Stat. § 7–1 that may have been practiced in certain ahupua'a "for so long as no actual harm is done thereby." *Id.* at 10, 656 P.2d 745.

Historically, however, the courts have interpreted section 7–1's explicit list of gatherable items to narrow the scope of the rights granted. *See* Stand.Comm.Rep. No. 57, reprinted in 1 Proceedings of the Const. Convention of Haw. of 1978, at 639 (1980); *Haiku Plantations Ass'n v. Lono,* 1 Haw.App. 263, 266, 618 P.2d 312 (1980); *see also, Oni v. Meek,* 2 Haw. 87, 94–95 (1858) (implicitly addressed Haw.Rev.Stat. § 7 via the Law of November 7, 1846, a predecessor of the Kuleana Act of 1850).

Similarly, the Hawaiian usage clause does not support an extension of native Hawaiian rights to the right of exclusive possession over lands not claimed under the Kuleana Act. Before the King extended the right of ownership to the common people, the native tenants' right to remain on the land was "at the will of the sovereign or superior, subject always to dispossession and redivision." *Hawaii Housing Authority v. Lyman,* 68 Haw. 55, 63 n. 3, 704 P.2d 888 (1985) (citation omitted). Therefore, customary Hawaiian usage before the Mahele did not include the right to perpetually reside on another's land. As previously discussed, after the Mahele there was no right to permanent and undisturbed possession of land for native tenants or hoaainas who failed to file a claim with the Land Commission subject to the Kuleana Act of 1850. *Dowsett v. Maukeala,* 10 Haw. 166 (1895).

Pai 'Ohana places great weight on the Standing Committee Report to the 1978 Constitutional Convention on proposed Haw. Const. art. XII, § 7, which stated that art. XII, § 7 would reaffirm and protect all rights possessed by ancient Hawaiian native tenants, while providing the State power to regulate these rights. Stand.Comm.Rep. No. 57, *reprinted in* 1 Proceedings of the Const. Convention of Haw. of 1978, at 639 (1980). The report further stated that the Committee never intended "to remove or eliminate any statutorily recognized rights or any rights of native Hawaiians from consideration under this section, but rather your Committee intended to provide a provision in the Constitution to encompass all rights of native Hawaiians, *such as access and gathering* (emphasis added)." *Id.* at 640; *See also, Pele Defense Fund,* 73 Haw. at 620, 837 P.2d 1247. Defendants concede that native tenants have rights under Hawaiian law; they do not agree that those rights extend to a right of permanent and exclusive occupancy upon the land of another.[30] Because of the

---

**29.** The Hawaii Supreme Court in *Pele Defense Fund* narrowly held that "native Hawaiian rights protected by article XII, § 7 may extend beyond the ahupua'a in which a native Hawaiian resides where such rights have been customarily and traditionally exercised in this manner," and remanded for trial the limited issue of whether native Hawaiian tenants who are Pele Defense Fund members can be denied continued access into undeveloped areas to exercise customary and traditional rights for subsistence, cultural, and religious purposes. *Pele Defense Fund,* 73 Haw. 578, 622, 837 P.2d 1247. In all other respects the judgment of the lower court was affirmed. *Id.*

**30.** The court notes that Defendants do not concede that native tenant rights, such as access and gathering rights, may be asserted against the federal government. However, that is not an issue in this motion since Defendant United States has in the past permitted the Pai 'Ohana members access to the land in question for religious and cultural purposes and has not suggested that they would not do so in the future. Indeed, the reason for the creation of the Kaloko–Honokohau National Park was to "provide a center for the preservation, interpretation, and perpetuation of traditional native Hawaiian activities and culture, and to demonstrate historic land use patterns as well as to provide a needed resource for the education, enjoyment, and appreciation of such traditional native Hawaiian activities and culture by local residents and visitors...." 16 U.S.C. § 396d(a).

nature of ancient Hawaiian rights and the examples of access and gathering included in the report, the Standing Committee Report clearly supports Defendants' contention, rather than rebuts it.

Moreover, in addition to protecting native tenant rights, Standing Committee Report Number 57 explicitly indicated that the drafters also desired to protect the rights of private land owners. It states: "Your Committee did not intend these [native tenant] rights to be indiscriminate or abusive to others[;] ... [and] reasonable regulation is necessary to prevent possible abuse as well as interference with these rights." [31] Furthermore, a second report, the Committee of the Whole Report Number 12, emphasized that art. XII, § 7 "does not attempt to grant unregulated, abusive and general rights to native Hawaiians...." Comm. Whole Rep. No. 12, *reprinted in* 1 Proceedings of the Const. Convention of Haw. of 1978, at 1016 (1980). Finally, Standing Committee Report No. 57 states that "a more accurate description of these rights is to refer to them as personal rights. Rather than being attached to the land, these rights are inherently held by Hawaiians and do not come with the land." *Id.*

In light of the foregoing authority, as well as the historical background discussed in Part I § B above, this court finds that Pai 'Ohana's claims of reserved rights of the native tenants under Hawaii law did not extend to the right of perpetual and exclusive occupancy upon the land of another. Pai 'Ohana's ancestors' failure to claim Kuleana title to 'Ai'opio, which rendered them tenants at sufferance of first, Leleiohoku and later, the Greenwell family, forecloses Pai 'Ohana's attempt to claim possessory rights to 'Ai'opio under Hawaii law.[32]

### E. *Pai 'Ohana's Rights of Individual Aboriginal Title*

 Pai 'Ohana states that its claims of occupancy and use in 'Ai'opio are also founded upon the federal doctrine of individual aboriginal title as established in *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923), and adopted as the common law of Hawaii under Haw.Rev.Stat. § 1–1. *See* Complaint at ¶ 4. Pai 'Ohana argues that the doctrine of individual aboriginal title is an extension of tribal aboriginal title, adopted by the United States Supreme Court in 1823. *See Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823).

Defendants argue that the doctrine of individual aboriginal title has never been adopted by the State of Hawaii and would not apply in this case if it had been adopted. First, Defendants argue that the doctrine of individual aboriginal title did not exist in 1892 when Hawaii adopted the common law. Second, Defendants argue that the elements of tribal aboriginal title and individual aboriginal title differ, as does the nature of their respective interests. Third, Defendants state that individual aboriginal title is inconsistent with Hawaiian law and customary usage. Fourth, Defendants assert that Pai 'Ohana has failed to meet the Ninth Circuit test for individual aboriginal title. Fifth, assuming, *arguendo,* that Pai 'Ohana had at some point acquired individual aboriginal title, Defendants assert it has been extinguished by either the Hawaii government or by the United States government. Finally, Defendants argue that individual aboriginal title is not a vested property interest that is protected by the Fifth Amendment.

 "Aboriginal title is a term of art used to describe an Indian possessory inter-

---

**31.** Stand.Comm.Rep. No. 57, reprinted in 1 Proceedings of the Const. Convention of Haw. of 1978 (1980).

**32.** Pai 'Ohana's interpretation of the law would create chaos in land ownership and occupancy throughout the State of Hawaii by reversing almost 150 years of settled Hawaii land law and jeopardizing over a century of conveyances and titles. Ironically, those who would be most in jeopardy are the individual native Hawaiians whose ancestors perfected their titles under the Kuleana Act. Anyone could claim their ances-

tors were "tenants" upon virtually any property within the State of Hawaii; they could then assert the right to reside upon such land to the exclusion of others, even the fee simple owners. It would be virtually impossible to verify or disprove these "tenant" interests since by their very nature they are "unrecorded" and unperfected. It should be noted that this type of chaos was precisely the type of problem that the Kingdom of Hawaii sought to avoid by enacting the Kuleana Act of 1850.

est in land which Indians have inhabited since time immemorial." . *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (citing F. Cohen, *Original Indian Title,* 32 Minn.L.Rev. 28 (1947)). Aboriginal title is a permissive right of occupancy granted by the federal government. *United States v. Gemmill,* 535 F.2d 1145, 1147 (9th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976) (citing *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 573–74, 5 L.Ed. 681 (1823)). It may be extinguished by the federal government at any time, although extinguishment will not be taken lightly. *Id.* "Congress' power to extinguish aboriginal title is supreme, 'whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise....'" *United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941); *Havasupai Tribe v. United States,* 752 F.Supp. 1471, 1478 (D.Ariz.1990), *aff'd,* 943 F.2d 32 (9th Cir.1991), *cert. denied,* 503 U.S. 959, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992). Congress may extinguish aboriginal title irrespective of who holds the underlying fee title in the land. F. Cohen, *Handbook of Federal Indian Law* at 489 (1982) (citing *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)); *United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). The establishment of a national park, pursuant to congressional authorization, extinguishes aboriginal title. *United States v. Pueblo of San Ildefonso,* 513 F.2d 1383, 1391, 206 Ct.Cl. 649 (1975) (holding that the establishment of the Jemez Forest Reserve effectively extinguished aboriginal title); *see also, e.g., Tlingit and Haida Indians of Alaska v. United States,* 177 F.Supp. 452, 467–468, 147 Ct.Cl. 315 (1959).

■ First, Defendants' argument to the contrary notwithstanding, Hawaii did not "adopt the common law as it existed in 1892—not 1923." *See* Defendants' Reply Memorandum at 3. In 1892, Hawaii adopted the common law of England, as ascertained by English and American decisions, "except as ... established by Hawaiian usage." Haw.Rev.Stat. § 1–1. This does not mean that American common law decided after 1892 does not apply to Hawaii. The common law is a system of "fundamental principles and reason ... rather than a fixed and inflexible set of rules." *Welsh v. Campbell,* 41 Haw. 106, 118 (1955). For this court to hold otherwise would be ludicrous and would exempt Hawaii from a century of development of the American common law. The statute states only, as the court in *State v. Zimring,* 58 Haw. 106, 566 P.2d 725 (1977) clarifies, that the Hawaiian usage exception in the statute must pre-date the law's enactment in 1892.[33] *Zimring,* 58 Haw. at 114–15, 566 P.2d 725; *In re Taxes,* 46 Haw. 292, 380 P.2d 156 (1963). Therefore, if Pai 'Ohana could prove that its custom and usage of 'Ai'opio, prior to 1892, established their right of occupancy and use based upon the doctrine of individual aboriginal title, then that doctrine, as established in 1923, would apply.

Second, turning to the doctrine of individual aboriginal title as established in *Cramer,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622, the Supreme Court has stated that the federal policy behind the development of the doctrine was "respect of the Indian right of occupancy which could only be interfered with or determined by the United States (citation omitted)." *Id.* at 227, 43 S.Ct. at 344. While it is true that this policy "had in view the original nomadic tribal occupancy," the Court also stated that in "its essential spirit it applies to individual Indian occupancy as well." *Id.*[34]

---

**33.** If there is any doubt as to this construction, it can be resolved by a careful reading of the *Zimring* court's statement: "Aside from acquisition of documented title, one can also show acquisition of private ownership through operation of common law *or* as established by pre–1892 Hawaiian usage pursuant to [Haw.Rev.Stat.] § 1–1...." *State v. Zimring,* 58 Haw. at 115, 566 P.2d 725. The Hawaiian usage mentioned in Haw.Rev.Stat. § 1–1 is usage which predated November 25,

1892, the date the law was approved. *State v. Zimring,* 52 Haw. 472, 479, 479 P.2d 202 (1970).

**34.** The Court in *Cramer* noted a second policy supporting the concept of individual aboriginal title: "that of inducing the Indian to forsake his wandering habits and adopt those of civilized life." *Id.* This court notes that the Ninth Circuit has held "that the policy of public land settlement that underlay *Cramer* no longer exists."

■ The essential elements of individual aboriginal title are established if an Indian [35] can show: "[1] that she or her lineal ancestors continuously occupied a parcel of land, as individuals, and [2] that the period of continuous occupancy commenced before the land was withdrawn for purposes of settlement." *United States v. Kent,* 945 F.2d 1441, 1444 (9th Cir.1991) (citing *United States v. Dann,* 873 F.2d 1189 (1989)). The Ninth Circuit stated that to establish individual aboriginal title, one must show actual possession by occupancy, enclosure, or other actions, to the exclusion of all others and that the aboriginal title had never been extinguished. *Dann,* 873 F.2d at 1196–99; *Havasupai Tribe v. United States,* 752 F.Supp. at 1480.

In *United States ex rel. Chunie v. Ringrose,* 788 F.2d 638 (9th Cir.1986), the court held that aboriginal title had been extinguished by the failure of the Chumash Indians to present a claim for the disputed land with the board of commissioners pursuant to the Act of 1851. *Chunie,* 788 F.2d at 646. The purpose of the Act of 1851 was "to authenticate titles, and to afford the solid guarantee to rights which ensues from their full acknowledgment by the supreme authority." *Id.* at 645 (citation omitted). "Any land not claimed within two years, and any land for which a claim was finally rejected, was deemed 'part of the public domain of the United States.'" *Id.* at 644–45; *see* Act of 1851, ch. 41 § 13.

■ The existence and extent of tribal real estate rights under prior sovereignties is governed by the law of the sovereign upon whose authority the claim rests. F. Cohen, *Handbook of Federal Indian Law,* 491 (1982) (citing *Chouteau v. Molony,* 57 U.S. (16 How.) 87, 14 L.Ed. 905 (1853); *Mitchel v. United States,* 34 U.S. (9 Pet.) 711, 9 L.Ed. 283 (1835)). The Act of 1851, adopted by Congress as a method of quieting land titles in California, is similar to the method established by the Hawaiian monarchy during the Great Mahele. As discussed above in Part I § D, the failure of Pai 'Ohana's ancestors to apply for a Kuleana grant foreclosed Pai 'Ohana's claim for fee simple title to 'Ai'opio. Following *Chunie,* the court finds that just as the Chumash Indians' aboriginal title was extinguished by failing to make a claim under the Act of 1851, so too was any aboriginal title that Pai 'Ohana may have claimed to 'Ai'opio extinguished by the government of Hawaii in 1854 when the allotted period to claim Kuleana title ended and Pai 'Ohana's ancestor's had failed to obtain Kuleana title to the land.[36]

Based upon the foregoing analysis, the court also finds that Pai 'Ohana has failed to show that their use and occupancy of the 'Ai'opio area was exclusive as required by the doctrine of individual aboriginal title. Pai 'Ohana stated at the hearing on the motion that although it felt its right of possession to 'Ai'opio was exclusive in nature, it had not as yet acted to exclude others from the area. Pai 'Ohana also stated that its relationship

*United States v. Dann,* 873 F.2d 1189, 1198 (9th Cir.1989). *Dann* held that an "Indian cannot today gain a right of occupancy simply by occupying public land … [u]nder current law, that occupancy could not be viewed as undertaken with the implied consent of the government," because the land in question had been withdrawn from entry and settlement by an Executive Order. *Id.*

**35.** Although neither party has addressed the issue of whether "Native Hawaiian" is synonymous with "Native American," nor is the court ruling today upon this issue, the court notes that in *Naliielua v. Hawaii,* 795 F.Supp. 1009 (D.Haw.1990), *aff'd,* 940 F.2d 1535 (9th Cir. 1991), this court stated:

Although Hawaiians are not identical to the American Indians whose lands are protected by the Bureau of Indian affairs, the court finds

that for purposes of equal protection analysis, the distinction … is meritless.

Native Hawaiians are people indigenous to the State of Hawaii, just as American Indians are indigenous to the mainland United States. As the Ninth Circuit Court of Appeals stated in *Pence v. Kleppe,* 529 F.2d 135 (9th Cir.1976), "the word 'Indian' is commonly used in this country to mean 'the aborigines of America.'" 795 F.Supp. at 1012–13 (holding that the United States' commitment to the native people of this state [Hawaii], demonstrated through the Admission Act and the Hawaiian Homes Commission Act, 1920, does not create a suspect classification which offends the constitution).

**36.** Moreover, as previously noted, another native Hawaiian, Leleiohoku, followed the required procedures. Leleiohoku applied for and was granted title to the property.

with the Greenwell family had been one of mutual respect and Pai 'Ohana had never excluded the Greenwells.

Finally, the court finds that the establishment by the United States Congress of the Koloko–Honokohau National Historical Park pursuant to 16 U.S.C. § 396d also effectively extinguished any aboriginal title that Pai 'Ohana may have had.[37]

Therefore, based upon the foregoing analysis in Part I, sections B–E, The court GRANTS Defendants' Motion for Summary Judgment as to Count I.

37. The court notes that when the Park was established members of the Pai 'Ohana voluntarily relinquished their rights to the property by: (1) Pedro Pai's acceptance of a $5,000 resettlement award; and (2) signing the Tenant Disclaimer statements.

While the court does not rule upon this issue now, nor is it necessary to do so in light of the extensive analysis of other issues in this order, the court notes that it appears that Pai 'Ohana could not prevail on this issue on the merits.

Pai 'Ohana states that when its members signed the Disclaimers they:

were promised [by the Greenwells] that if we signed, we would be able to continue to practice the customs and traditions of our ancestors ... [a]t the same time, Kenny Young and others from the Lanihau Corporation were on the sidelines threatening to forcefully evict any and all members of the Pai 'Ohana if they refused to sign the form. The Disclaimers were signed by the family in the belief that the Greenwells would not deceive them and that their signatures would ensure their continuing residence at 'Ai'opio on a long term basis.

Declaration of Malani Pai attached to Plaintiff's Memorandum in Opposition.

However, the Disclaimers state, in pertinent part:

... we are occupying said land as tenant(s) of said owner under the agreement described hereinbelow; that we (I) have occupied said land since *[left blank]*; that we *claim no right, title lien or interest in and to said premises or any part thereof by reason of said tenancy or otherwise, and will, subject to the terms of the hereinbelow described agreement, vacate said premises upon demand for the possession of said lands by the United States of America.*

Tenant Disclaimer, Exhibit E1 attached to Defendants' Memorandum in Opposition (emphasis added).

Pai 'Ohana suggests in its Declaration that its members were under duress to sign these Disclaimers. However, Pai 'Ohana does not argue duress in its extensive memoranda before the court, and the court will not address it except to note that: (1) the allegations do not appear to rise to the requisite level needed to prove legal duress and (2) the alleged promises and 'threats'

## II. *Count II and Count III*

■ Pai 'Ohana alleges that Defendants violated Pai 'Ohana's right of procedural due process guaranteed under the Fifth Amendment to the United States Constitution (Count II), and that Defendants' attempt to evict Pai 'Ohana is a taking without just compensation in violation of the Fifth Amendment to the United States Constitution (Count III).

First, the court notes that Pai 'Ohana has withdrawn any claims based upon the Hawaii

came from third parties (the "Greenwells," and "Kenny Young and others from the Lanihau Corporation") who could not possibly have affected Plaintiffs' rights after the sale. No threats were alleged to have come from Defendant United States.

Pai 'Ohana does expressly argue that the conduct described by Malani Pai is insufficient to constitute waiver under state law and that the Disclaimers are notable because they do not state that the party to be bound is waiving his rights of use and occupancy. Pai 'Ohana also states that "the government has made no showing that the Pai family was advised or that they knew in advance, that the 'title' claims that they would be giving up included claims to aboriginal title." Plaintiff's Reply Memorandum at 11.

Waiver is the intentional abandonment or relinquishment of a known right or privilege. *Campbell v. Wood*, 18 F.3d 662 (9th Cir.1994), cert. denied, — U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). Waiver will be found where a party intentionally relinquishes a right, or when the party's acts are so inconsistent with intent to enforce the right as to induce a reasonable belief that the right has been relinquished. *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551 (9th Cir.1991).

The Disclaimers are more than explicit enough to give notice to Pai 'Ohana that it was relinquishing any claims to rights, title liens or interests in the land at issue. Moreover, unlike the cases cited by Plaintiff, Pai 'Ohana's waiver here is not construed by either silence or delay. Members of Pai 'Ohana actually signed the Disclaimers, which shows their intent to relinquish any rights they may have had to the property. Pai 'Ohana's actions in signing the Disclaimers as well as applying for the Special Permits are simply inconsistent with any intent to enforce a right of permanent use and occupancy of the property. Further, there is nothing in the record to indicate that Pai 'Ohana could not have filed a lawsuit similar to the one at issue here when they executed the Disclaimers if they felt the Disclaimers contained provisions inconsistent with their rights of land occupancy and use.

Landlord–Tenant Code, Haw.Rev.Stat. § 521–71. Second, because the court finds that Pai 'Ohana has no aboriginal title in 'Ai'opio, the only possible property interest that Pai 'Ohana might have to sustain a claim of procedural due process or a Takings Clause violation is that which was granted by the Special Use Permits. These Special Use Permits are subject to revocation at the Park Services' discretion. *See* Exhibit C, attached to Defendants' Memorandum in Support of Motion.

"The law is settled that special use permits create no vested property rights." *Paulina Lake Historic Cabin Owners Assoc. v. U.S.D.A. Forest Service,* 577 F.Supp. 1188, 1193 (D.Ore.1983); *(see, e.g., United States v. Fuller,* 409 U.S. 488, 492–93, 93 S.Ct. 801, 804–05, 35 L.Ed.2d 16 (1973) (further citations omitted)). Termination of such permits does not require compensation because they are not property interests recognized by the Fifth Amendment. *See United States v. Petty Motor Co.,* 327 U.S. 372, 376, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946); *United States v. 5.96 Acres of Land,* 593 F.2d 884, 889–89 (9th Cir.1979). Therefore, based upon the foregoing, the court finds that the facts do not support a claim of either a procedural due process or a Takings Clause violation of the Fifth Amendment. Accordingly, the court GRANTS Defendants' Motion for Summary Judgment as to Counts II and III.

### III. *Count IV*

■ Pai 'Ohana alleges that defendants infringed Pai 'Ohana's property rights without due process of law by shutting off Pai 'Ohana's water supply and by interfering with Pai 'Ohana's conduct of religious rites, in violation of the Fifth Amendment to the United States Constitution. Pai 'Ohana has offered no evidence, beyond its Complaint, of Defendants' role in turning off Pai 'Ohana's water or interference with Pai 'Ohana's conduct of religious ceremonies at 'Ai'opio. Defendants have stated that they did not turn

off the water, nor did they refuse to issue Special Use Permits allowing Pai 'Ohana to conduct religious ceremonies at any time. Defendants' Memorandum in Support of Motion to Dismiss. Defendants also state that they have not interfered with the ceremonies Pai 'Ohana has continued to conduct at 'Ai'opio without benefit of the Special Use Permits. These facts are undisputed by competent evidence before the court.

While it is true that this court may not make credibility judgments at this stage in a proceeding, it is also true that an opposing party may not merely stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial.[38] *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). Therefore, the court finds that Pai 'Ohana has failed to meet its burden of raising a genuine issue of material fact. Accordingly, the court GRANTS Defendants' Motion for Summary Judgment as to Count IV.

### IV. *Pai 'Ohana's Motion to Certify Question to Hawaii Supreme Court.*

■ The Supreme Court of the United States has approved of the limited use of certified questions to state supreme courts when a federal court case involves an important question of state law which is both unclear under state legal precedent and would be determinative in the instant case. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393–98, 108 S.Ct. 636, 643–46, 98 L.Ed.2d 782 (1988); *Bellotti v. Baird,* 428 U.S. 132, 150–52, 96 S.Ct. 2857, 2867–68, 49 L.Ed.2d 844 (1976); *Lehman Bros. v. Schein,* 416 U.S. 386, 389–92, 94 S.Ct. 1741, 1743–45, 40 L.Ed.2d 215 (1974); *Clay v. Sun Ins. Office,* 363 U.S. 207, 212, 80 S.Ct. 1222, 1225–26, 4 L.Ed.2d 1170 (1960).[39] In *Lehman,* the Supreme Court explained:

---

**38.** Further, as noted previously, it is undisputed by competent evidence before the court that members of Pai 'Ohana have entered upon the property, erected barriers, and asserted exclusive occupancy upon the land in question.

**39.** The cases mentioned herein regarding certification have extensive subsequent case histories in light of the certified questions. These cases are mentioned only as examples of certification and not for their substantive holdings, therefore, the court will omit the subsequent case histories.

[Use of state certification procedures] does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism. Its use in a given case rests in the sound discretion of the federal court.

416 U.S. at 391, 94 S.Ct. at 1744 (footnote omitted). Questions should not be certified if the answer is reasonably clear. *City of Houston v. Hill,* 482 U.S. 451, 469–73, 107 S.Ct. 2502, 2514–15, 96 L.Ed.2d 398 (1987).

Although federal courts should not shirk their duty by routinely certifying questions to state supreme courts, certification under appropriate circumstances can result in significant conservation of the litigants' time and money as well as judicial resources. *Richardson v. City and County of Honolulu,* 802 F.Supp. 326, 344–46 (D.Haw.1992). This court has also stated that where certification would further none of the above purposes and the answer to the certified question is not determinative, certification should be denied. *Partington v. Bugliosi,* 825 F.Supp. 906 (D.Haw.1993). Moreover, where there is "sufficient state law to enable this court to make an informed decision on [the] issues" certification is inappropriate. *Richardson,* 802 F.Supp. 326, 344, n. 30. The decision to certify a state law question is within the sound discretion of the federal district court. *Id.; Louie v. United States,* 776 F.2d 819, 824 (9th Cir.1985).

The Fifth Circuit's certification process has been widely recognized and followed. *See,* 1A Pt 2 Moore's Federal Practice ¶ 0.203[5] (1994); 17A Wright and Miller § 4248 (1988). The Fifth Circuit has stated that the most important considerations for certification are:

the closeness of the question and the existence of sufficient sources of state law—statutes, judicial decisions, attorney general's opinions—to allow a principled rather than conjectural conclusion. . . . And we must also take into account practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response.

*Florida v. Exxon,* 526 F.2d 266, 274–75 (5th Cir.1976). The Fifth Circuit has said, "we use much judgment, restraint and discretion in certifying. We do not abdicate." *Barnes v. Atlantic & Pac. Life Ins. Co. of America,* 514 F.2d 704, 705 n. 4 (5th Cir.1975).

■ For a federal court to certify a question to a state supreme court, the state court must provide a specific procedure for receiving such questions. Section 602–5(2) of the Hawaii Revised Statutes ("Haw.Rev.Stat.") provides that the Hawaii Supreme Court shall have jurisdiction to answer any question or proposition of law certified to it by a federal district court, if the rules of the state supreme court so provide. The Hawaii Supreme Court has authorized certified questions pursuant to Rule 13 of the Hawaii Rules of Appellate Procedure.

■ Rule 13(a) provides that a federal district court may certify a question to the Hawaii Supreme Court when the question (1) concerns Hawaii law; (2) which is determinative of the cause; and (3) there is no clear controlling precedent in the Hawaii judicial decisions. *See, e.g., Robinson v. Ariyoshi,* 65 Haw. 641, 658 P.2d 287 (1982), *modified in part,* 66 Haw. 528, 726 P.2d 1133 (1983). The entertaining of a certified question lies within the discretion of the supreme court. Haw. Rev.Stat. § 602–5(2); Haw.R.App.Proc. Rule 13(a). The Hawaii Supreme Court may decide that the issues presented are inappropriate for certification, or decline certification. *Smith v. Cutter Biological, Inc.,* 911 F.2d 374, 376 (9th Cir.1990).

■ Pai 'Ohana moves this court to certify the following question to the Hawaii Supreme Court:

Assuming continuity of use and occupation, since before the Mahele, of an undeveloped portion of an ahupua'a in which the rights of the native tenants within were reserved by the Land Commission, does a native tenant whose ancestors did not apply for a kuleana retain rights of use and occupy (sic) to the land?

Plaintiff's Motion to Certify a Question to the Hawaii Supreme Court.

Pai 'Ohana seeks certification of its question to determine the issue of whether the rights reserved to the native tenants within

Honokohauiki encompass rights of use and exclusive occupancy that comport with the doctrines of reserved rights and individual aboriginal title. Pai 'Ohana asserts that certification is appropriate because: (1) state law is determinative on the issue and the Hawaii courts are uniquely qualified to construe the scope of Pai 'Ohana's land rights regarding 'Ai'opio; and (2) there is no clear controlling precedent for the district court to follow concerning native Hawaiians' rights of use and occupancy.

Defendants argue that certification is not appropriate because: (1) significant factual issues remain to be resolved; (2) the Hawaii Supreme Court's answer to the certified question may not be determinative; and (3) because Hawaii law clearly bars Pai 'Ohana's claims.

Based upon the court's reasoning, analysis and findings in Parts I–IV above, the court finds that certification is inappropriate in this case. First, even assuming that the Hawaii Supreme Court answered Pai 'Ohana's question affirmatively, this answer would not be determinative of the issue as required. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 395–98, 108 S.Ct. 636, 644–46, 98 L.Ed.2d 782 Haw.R.App.P. 13(a). The court has found that the federal doctrine of aboriginal title bars Pai 'Ohana's claims. *See* Part I § E, *supra.*

Second, and most important, as extensively discussed above, there is "sufficient state law to enable this court to make an informed decision on [the] issues," as evidenced by the cited Hawaii case law, statutes and constitution. *Richardson,* 802 F.Supp. at 344, n. 30. The court has found that long-standing Hawaii law bars Pai 'Ohana's claims. *See,* Part I §§ A–D, *supra.* If this court were to certify cases based upon a party's hope that it may have a chance of convincing the Hawaii Supreme Court to overturn a century of existing state law, this court would abdicate its responsibility to apply Hawaii law as it exists and would find itself certifying a substantial portion of its docket to the Hawaii Supreme Court.

Finally, certification in this case would further none of the stated purposes of certification.

Therefore, the court DENIES Pai 'Ohana's Motion to Certify a Question to the Hawaii Supreme Court.

### CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion to Certify a Question to the Hawaii Supreme Court.

IT IS SO ORDERED.